## INTERCHEMICAL CORPORATION v. SINCLAIR & CARROLL CO., Inc.

District Court, S. D. New York.
May 22, 1943.

Robert W. Byerly, of New York City, for plaintiff.

Hoguet, Neary & Campbell, of New York City, for defendant.

SYMES, District Judge.

This suit involves the validity of Letters Patent No. 2,087,190, granted July 13, 1937, to the International Printing Ink Corporation, New York—an Ohio corporation—the name of which has since been changed to the Interchemical Corporation, the plaintiff herein.

The original inventor and patentee is Albert E. Gessler. The patent was applied for July 14, 1932, renewed April 11, 1936, and finally issued July 13, 1937. According to the patent his invention relates to printing inks, and has for its object the preparation of a novel type of printing ink claimed to possess many advantages over the printing inks theretofore known, and overcoming many of the disadvantages associated with the procedure which it has been necessary to use in order that such inks may be properly applied to produce a satisfactory print.

It is claimed the ink described in the patent has introduced a rather revolutionary change in the very old art of printing. Before this patent it seems printing inks have often been made by grinding pigments in oil or oil varnishes, or both, and had been characterized by their relatively slow rate of drying, depending upon polymerization, oxidation and/or absorption, and as a result have experienced great difficulty in the printing process by greatly delaying the speed of operation. This necessitated the maintenance of large and cumbersome auxiliary equipment and extra labor at great expense, and also a dependence of the printing process upon the time required to obtain a complete drying.

Ordinarily printing has been done by spreading a thin ink film on a series of rollers and then taking the ink from the rollers on to raised type, or cuts, and pressing those against the paper. To do this successfully it was necessary the ink be rather thick, of the consistency of molasses. These inks have been made out of drying oils, principally linseed oil, with which the pigment was mixed. Linseed oil is what is known as a drying oil, in that it gradually hardens when exposed to the air, due to its absorption of oxygen from the air and changing its state. This drying ordinarily takes a day—and even by the use of so-called dryers; that is chemicals to hasten its absorption of oxygen, it formerly took at the best two or three hours to dry. This meant that ordinarily the printed impression did not become hard and dry until two or three hours after it was made. This caused delay and expense, particularly where it was sought to print on both sides of the paper, because having printed one side it was necessary to wait until that side dried before the other side of the paper could be printed. This because the ink, not being dried, would smudge or offset.

Newspapers are printed very fast, because they use paper resembling blotting paper, which consists of a long web of paper run over a cylinder with type on it, printing one side of the paper, which then goes over another cylinder which prints on the other side. It is then cut up and folded right on the press. This is possible, because the paper being like a blotter, absorbs the ink and enables the other side to be printed at once.

When it comes to finer quality of printing—say on good paper with a smooth finish, which it is necessary to use if printing of pictures and half tones is to be done—a quality of paper very different from that used for newspapers is necessary. Formerly, for instance, when it came to printing magazines with large circulations, such as the Saturday Evening Post, Colliers, etc., it was necessary to use a flat bed press, printing on one side of the sheet, and then pile up between the sheets

with something to keep them from sticking, and wait three or four hours before printing the other side.

As the circulation became larger the web press was used. Trouble was encountered with the ordinary standard linseed oil, because ink on the first side of the web would not dry. Many experiments were tried to make it possible to immediately print the second side. A traveling blotter was used which traveled along behind the paper, and then was rolled up on a different roll. This not only did not prevent smudge entirely, but took a good deal of the wet ink off the paper, so the final copy was light; that is, did not have ink enough on it.

Therefore the art attempted to make the ink dry faster by causing the drying oil to absorb oxygen faster. This by heating and blowing ozone on it. That is, after the sheet came out from the type, and before the second side was printed, it was passed over a steam roller or device which warmed the paper. At the same time ozone was blown on it—ozone being a very active form of oxygen—which was absorbed by the oil faster than it would be if it was just quietly exposed to the air.

This method did not prove commercially successful. Shooting ozone on the paper was a difficult and dangerous thing to do in a printing plant, although it did make the drying oils oxidize more rapidly than they had before. That seems to have been the status of the art when the invention in question appeared.

The next step was an attempt to speed up printing by using volatile solvents that would evaporate very quickly. But this presented a new difficulty, in that the ink would dry on the rollers before printing, would not print properly as the ink must be wet when printed. It proved more successful, perhaps, in what is known as rotogravure printing, but did not help in the ordinary printing from raised type, with which the thin, watery ink cannot be used. The patentee, Gessler, a chemist employed by a chemical company making pigments and chemicals, was asked by an ink manufacturer to make an odorless ink, and while engaged in that research he claims to have developed the ink in question, which was not only odorless, but could be dried very rapidly on a press. He states in his patent (p. 1, column 1, line 41), after stating the problem, that it had been proposed to use various types of lacquers in printing processes, particularly cellulose lacquers, because it was well-known that such lacquers are characterized by a high degree of volatility.

Such rapid drying, however, would render an ink made therewith unsuitable for printing from plates or rollers, because they will quickly dry and harden thereon, and will have only the effect of yielding dry or half dry material to the printing form or type, and no satisfactory impression can be made on the material to be printed.

He states (p. 1, column 2, line 3): "1 have discovered, however, that if in contrast to the above, cellulose compounds, particularly nitrocellulose, are dissolved in solvents with high boiling points, this difficulty may be avoided".

Further he states that if the solvents used are too slow in evaporating, the same difficulties which occur in the case of ordinary oil varnish inks, are encountered. He then states he has found (p. 1, column 2, line 10): " * * * that certain such high boiling solvents, very well adapted to dissolve cellulose compounds, have at room temperature such slow drying properties that, while they may be employed as solvents in this ink, and while an excellent impression may be transferred to the surface to be printed upon, the impression will nevertheless be so moist that it is likely to become blurred or smudged by rubbing after many hours or even days."

Then, line 19: "This defect, however, may be remedied by the present invention, which involves a recognition of the principle that some of these high boiling solvents exhibit, at temperatures elevated above room temperatures, such a remarkable and quick increase in their vapor pressure that they volatilize rapidly, while at the same temperatures others show little change in their vapor pressures and therefore are practically non-volatile".

By room temperature is meant 20 to 25 degrees centigrade.

This ink of Gessler's is different from the ordinary linseed oil ink, being made of a thickener dissolved in a solvent. The thickener may be a resin or nitrocellulose, or some material of that sort dissolved in the solvent, making a thick solution like linseed oil. However, it does not dry by oxidation like linseed oil, but does dry because the solvent evaporates leaving the thickener which acts as a binding sub-

884

stance that anchors the pigment to the paper. A successful ink for the purposes of the art in question has to be like linseed oil, capable of being spread out in a thin film that can be put on the type without it drying.

He claims to have studied the problem and experimented with a number of different solvents, all of which were rejected by printers because they became hard or gummy on the rollers, and would not print. A few printed all right, but took longer than a linseed oil ink to dry, so were not an improvement.

It finally came to Gessler's attention, he testified, that some. printing presses were provided with steam-heated rollers. He claims he solved the problem by producing his. ink which dried almost instantly when run on an ordinary press provided with a heating drum, or some means of heating the paper immediately after it had gone through the rollers of the press. That is, he claims to have produced an ink that could be printed from raised type and dried instantly. This, it is claimed, was a great boon to the printing industry, because it meant much more rapid, as well as high-grade printing. His ink differed from linseed oil ink in the use of a solvent that dried rapidly.

The disclosure of the patent he claims, is the discovery for the first time that this problem could be solved; that a printing ink could be made wet enough to spread on the rollers, and do the printing without drying thereon, and that could be dried immediately thereafter. He then goes on telling the art how to make it, saying: "You have got to use a binder dissolved in a solvent, and you have got to use a solvent of particular vapor pressure".

Vapor pressure is the quality of a substance, such as a liquid, which causes it to evaporate. This pressure develops inside a liquid and tries to force the particles out of the liquid. It is common knowledge, of course, that a great many liquids, in fact most liquids if left alone, will eventually evaporate. That's because this so-called vapor pressure developed by the molecules inside the liquid tends to push them through the surface and out. This pressure, according to experts, is a perfectly definite, measurable characteristic; that is, the amount of vapor pressure a liquid has at any given temperature can be measured. Vapor pressure determines the rate of evaporation, is a physical property of the

liquid itself, depending upon temperature to a certain extent. For instance, when a liquid is boiling actively, its vapor pressure is equal to the pressure of the atmosphere pushing down on it. The main statement of the claim of the patent is: "A printing ink which is substantially non-drying at ordinary temperatures and dries instantly on heating of the printed matter, * ·* * the liquid component having a vapor pressure at 20° C., as low as that of diethylene glycol monobutyl ether at 20° C., and the major part of the liquid component having a vapor pressure which at 150° C. approximates that of ethyl alcohol at ordinary temperatures and forming a stable solution with a solid component".

Translating this into language that may be comprehended by the man in the street, it means the printing ink in question is substantially non-drying at ordinary temperatures, and dries instantly on heating of the printed matter. The claim is there had been no such thing as an ink that dried instantly by heating; that Gessler's would dry instantly by heating and was therefore imitated, adopted and used.

By using this ink the printer is enabled to run a web of paper through the press at a high speed. The web is then run through the heating device, which evaporates the solvent, thus drying the ink, and permitting the web to be immediately run through the press again and printed on the back side. Concededly the heating device, old in the art and not patentable, is an important part of the patent, which would not have taught anything if it had simply suggested the putting of butyl carbitol in the ink to see what happened.

The patent states you must have a solvent of certain definite vapor pressure characteristics. It names butyl carbitol as possessing the particular vapor pressure characteristics necessary to make the ink, and brings about the essential disclosure claimed for the patent, which is, in short, a printing ink that will stay soft on the rollers, yet dry instantly on application of heat—something that had never been done before, according to the claim.

The defendant in 1938 began to make one of these so-called heat-set inks, adopting as its solvent a petroleum fraction taken off the top of ordinary kerosene, with a vapor pressure it claimed to be about a third of the vapor pressure of butyl carbitol. The record establishes that Gessler was trying to make an odorless ink,

and when he was told by Cray that heating means were used on the presses, he immediately picked out—according to his counsel—one of the inks which he had previously made for an odorless ink and pointed out that that ink would work as a quick-drying ink on a press with a heater. He had never been in the printing business. He says he studied the question of making the ink out of something other than linseed oil, and also the question of getting a solvent and binder in an ink which would be odorless, and not evaporate, dry or harden on the usual long series of printing rollers.

He claims to have done this in 1930, furnishing the ink to one printing concern, which did not use it because it would not dry fast enough on the paper. According to his counsel Gessler brought out, and disclosed in his patent, two entirely new ideas. First: That to stay soft on the long series of printing rollers, it was necessary to have a solvent with a vapor pressure as low as that of butyl carbitol; that is .02 of a millimeter—an extremely low pressure. That is: It was necessary to have a solvent with a vapor pressure as low as that of butyl-carbitol in order for the ink to remain stable on the rollers. And, secondly, something he claims he did not previously know until told by Cray, that all presses had heaters; that one could get instant drying of a thick film of ink on the paper if one picked a solvent like butyl-carbitol, the vapor pressure of which rises rapidly when you heat it up to between 100° and 150°; the temperature to which the paper can be heated without burning or scorching.

It is claimed the prior art was interested because those who had studied the problem were under the impression the solvent had to be actually boiled off in order to get instant drying. There is testimony that Gessler furnished his butyl carbitol ink to the Cray-Finne Company in 1932. The latter added pigment and it was tested out at the Patterson Parchment Paper Company and demonstrated for the first time as a typographic ink which would set moist on the press and dry instantly by heat.

The Curtis Publishing Company, publishers of the Saturday Evening Post, heard of it, became interested and gave it a trial. The only complaint made by the Curtis Company was that after a long run the printing rollers would develop very fine cracks. Dr. Gessler then adopted a new solvent, to wit, butyl carbitol acetate, which had a vapor pressure similar to that of butyl carbitol. This had very little effect on the rollers. This new solvent was tried out on the Curtis Company presses, when Gessler saw for the first time an imitation of his ink made by the Levey Company—the regular ink supplier of the Curtis Company—running on the same press. It is therefore charged their ink maker had produced a heat setting ink that acted similar to Gessler's. The Curtis Company thereupon threw out the Gessler ink in favor of a less expensive ink made by Levey.

Thereafter attempts were made to imitate the Gessler ink with a cheaper solvent. Mr. Cray tried various petroleum products that were on the market, such as kerosene and fuel oil solvents. The Continental Oil Company, after experimenting and testing different petroleum cuts, produced a petroleum cut which was a satisfactory substitute for butyl carbitol. It was a simple matter to substitute a petroleum cut with the same vapor pressure as butyl carbitol, the only requirement being it must have a low vapor pressure at room pressure, and the right pressure at high temperatures.

Butyl carbitol was not entirely successful as a solvent. Although it did not dry on the presses and dried out in the heaters, it caused the surfaces of the printing glue rollers to crack after a long-continued run. So Gessler says he looked around for a new solvent that would overcome this, and after research work in the Mellon Institute in Pittsburgh, found a solvent called butyl carbitol acetate, which he adopted as a substitute for butyl carbitol where the ink was used on glue rollers. However, he made no change for the ink used on rubber rollers. The substitution of the acetate for butyl carbitol prevented the glue rollers from absorbing moisture or water.

To sum up: Gessler claims he invented a printing ink which, distinguishable from the prior art, not only as to oil varnish inks of the linseed type, but (p. 1, column 1, line 41): "It has also been proposed to use various types of lacquers in printing processes, particularly cellulose lacquers. As is well known, the cellulose solvents used in these lacquers are characterized by a high degree of volatility. Indeed, this characteristic is considered an advantage in lacquers, for in the ordinary use to

which lacquers are put, a rapid drying or hardening is highly desirable".

The patent then continues (line 49): "However, it is obvious that such rapid drying renders inks made on this principle unsuitable for printing from plates or rollers; for, while they may be applied to printing plates or rollers, they will quickly dry and harden thereon and they will have only the effect of yielding dry or half dry material to the printing form from which, therefore, no satisfactoy impression can be made on the material to be printed".

He then states the principal improvement he has discovered is that: "I have discovered, however, that if in contrast to the above, cellulose compounds, particularly nitro-cellulose, are dissolved in solvents with high boiling points, this difficulty may be avoided".

What Gessler really did, therefore, was to discard the rapidly volatilizing solvent of the prior art lacquered inks, and use in its place a solvent which did not evaporate quite so fast. In line 20, column 2, p. 1 he states: "This defect", [that is the smudging] "may be remedied by the present invention, which involves a recognition of the principle that some of these high boiling solvents exhibit, at temperatures elevated above room temperatures, such a remarkable and quick increase in their vapor pressure that they volatilize rapidly, while at the same temperatures others show little change in their vapor pressures and therefore are practically non-volatile".

In short, his idea embodies the use of a solvent of a type that will keep the ink soft and liquid while it is being spread on the rollers and making the impression on the paper, but which having a high degree of volatility is easily dried by heat applied to the web immediately upon completion of the printing operation.

He then says he found butyl carbitol to be a solvent meeting these requirements, because it had a quick increase in vapor pressure at temperatures above room temperature, so would volatilize rapidly, and any rapid evaporation at room temperature is prevented by the use of a solvent with a high boiling point.

Turning to the defendant's case we find it pleads, in addition to lack of a patentable invention, that the claims of the plaintiff's invention are anticipated by the prior art, citing a long list of patents, only a few of which it is necessary to notice.

The first patent cited in defense is that of Lefferts and Stevens, No. 380,654, issued April 3, 1888. This invention relates to an improved ink for printing on celluloid and other pyroxyline compounds, the ingredients being first (p. 1, col. 2, line 51), a solvent or mixture which is a solvent of pyroxyline; second, a pigment or coloring material in powdered form; third a gum, or gums, or binding agent for holding the particles of pigment together.

In describing the function of the solvents, which is to penetrate the material and serve as a vehicle for carrying the color and fastening it onto the surface, the patentee says it is desirable that they be of low volatility. And (p. 2, col. 1, line 63): "As above stated, it is desirable that the substances used for this office be of a slow-drying nature by virtue of which property they will keep the ink in a moist condition for a long time, producing an action somewhat similar to that of linseed-oil used in the preparation of common engraving or printing ink".

It is then pointed out that this improved ink, when used in connection with heat and pressure, as above stated, produces a hard impression, and the printed sheets or articles may be piled together after they are taken from the press. The inventors then point out that in compounding the ink for use in type printing, it is important that the mixture be of a slow-drying nature, as the ink is spread over a large surface, which naturally permits of a rapid evaporation of the volatile ingredients. This, of course, is the problem stated by Gessler, which he claims to have solved in the same manner. It would therefore seem that the Lefferts and Stevens patent, while old, teaches what is necessary in order to make a heat-set ink, such as Gessler describes.

Next cited is the Howard Waters Doughty patent, application filed August 14, 1922, and patent issued December 26, 1922, No. 1,439,696. This invention is said to relate to inks and vehicles therefor, and particularly to metallic inks suitable for use in stamping titles and decorative designs on book bindings. This patent, however, is apparently not confined to metallic ink, for the inventor says (line 67, col. 2, p. 2): "The color will depend upon the particular

pigment employed which may be other than metallic in character".

He states the difficulty which has prevented the use of metallic inks at the outset to be due to vehicles which dry too rapidly on the inking rolls, covering them with a gummy coating, preventing transfer of the ink to the type or die, and that the object of his invention is to provide an ink having the necessary properties, including comparative slowness in drying, without a tendency to become gummy, and a transference of the ink through inking rolls to the type, or die, rapid drying when applied to the work, etc. (p. 1, col. 2, lines 55-70).

He then says in the second column, first page, that the desirable properties sought, to wit, slowness in drying without the tendency to become gummy, etc., may be obtained by using a suitable medium that will permit rapid drying of the ink by the application of heat to the type, or die, and one that should be volatile; that is capable of being vaporized without carbonization, with a boiling point relatively high to reduce vaporation at atmospheric temperatures, and thus prevent rapid drying on the ink rolls. Furthermore, that the medium must be a solvent for the body of the vehicle, with a boiling point within 200° and 300° C., 250° C. being most desirable. It will be recalled that the boiling point of butyl carbitol is within this range.

It is apparent at once that Doughty is talking about a printing ink with a volatile solvent that will not dry on the rolls, and capable of being dried by heat, the patent saying (p. 1, col. 2, line 62): "The medium should be volatile, i. e., capable of being vaporized without carbonization, but its boiling point should be relatively high to reduce vaporization at atmospheric temperatures, and consequently to prevent rapid drying on the inking rolls".

Next, adverting to the McElroy patent, No. 1,450,692, application filed June 16, 1922, patent granted April 3, 1923, the object is stated to be (p. 1, col. 1, line 24): " * * * the production of improved printing inks * * * characterized by" (p. 1, col. 1, line 34), "the qualities of drying immediately under the relatively high temperature preferred in embossing metallic powders; * * * of high boiling point and of low volatility".

And (p. 2, col. 2, line 96), that is why it " * * * should be used * * * at a temperature substantially that of the boiling point of the solvent vehicle. As will be obvious, however, the ink set forth may be used at lower temperatures, or cold, and the impression artificially dried thereafter".

Which, as counsel points out, you can print it as it is in the fountain, and then when the paper has the ink applied to it, it can be artificially dried. That the McElroy patent is not confined to metallic inks is indicated by the statement (p. 1, col. 1, line 20): "Our invention relates generally to printing inks and particularly to those having metallic powders as their pigments".

Jirousek in his patent, April 10, 1934, No. 1,954,627, application filed April 18, 1932, states the problem as Gessler does, to wit (p. 1, col. 1, line 1); that with the customary inks a great loss of time is incurred in setting or drying, before the further steps of cutting, folding, assembling and binding can be attended to, and that efforts to overcome this handicap have resulted in premature hardening of inks on the surfaces of the ink rolls, etc. That a composition, however, which can set quickly, dry rapidly and also handle and feed properly, and distribute freely, is an important desideratum highly desired in the art. That: "To the accomplishment of the foregoing and related ends, the invention, then, comprises the features hereinafter fully described, and particularly pointed out in the claims". (p. 1, col. 1, line 15). And describes his formula as follows: "In the use of such compositions, immediately after the impression is made, heat should be applied, and most advantageously this may be accomplished by a suitable heater, electric, gas, etc. arranged on or adjacent the press, so that the delivered printed impression is subjected to a substantial degree of heat to complete the setting action". (p. 1, col. 2, line 71.)

The exact process stated by Gessler, who says that with his ink the printing operation may be carried on in the ordinary manner and at ordinary temperatures, and "At the conclusion of the printing operation, the printed materials may be subjected, in known manner, to sufficient heat to dry the thin film of the print very rapidly". (p. 2, col. 2, line 17.)

He pointed out next that no time, labor or material is wasted in delays incident to prolonged drying of the printed goods under the processes then in use.

Further, Jirousek points out that by his method "Jobs can be printed on both sides in one operation with one or more colors on

both sides of the sheet without smearing or offset, and trapping or superimposing of colors takes place without requirement of particularity relative to printing tack, and the work may proceed to the next operation, such as cutting, folding, stitching, trimming, and other bindery operations". (p. 1, col. 2, line 109.) The difficulty Gessler claims to have overcome.

In Claim 3 the Gessler patent states: "A printing ink which is substantially non drying at ordinary temperatures and dries instantly on heating of the printed matter * * *". (p. 3, col. 1, line 18.)

And further on says: " * * * substantially all of the liquid component having a vapor pressure at 20° C. as low as that of diethylene glycol monobutyl ether * * *". (p. 3, col. 1, line 29.) 20° C. is the same as 70° F., and is referred to as room temperature.

Next this solvent must have, according to the patent in suit, " * * * the major part of the liquid component having a vapor pressure which at 150° C. approximates that of ethyl alcohol at ordinary temperatures * * *". (P. 3, col. 1, line 32.) 150° C. is as hot as you can heat a piece of paper without scorching or burning it.

The claim is therefore that the vapor pressure of the liquid you use must, at 150° C. be similar to that of ordinary alcohol at room temperature. In other words you have got to have the vapor pressure as low as that of butyl carbitol at room temperature—which is very low indeed. This is required, because under the Gessler method, when the temperature goes up to 150°, the solvent must possess a high volatility and evaporate as quickly as ethyl alcohol would.

Plaintiff alleges that before the alleged infringement by the defendant its ink was in use commercially, with one change, from that described in the patent, to a cheaper solvent substituted for the solvent mentioned in the patent, which was mentioned only to indicate the right vapor pressure; but now a cheaper solvent—butyl carbitol acetate—is used, which has the same vapor pressure characteristics. This change was necessitated because, as the record discloses, many printing concerns who tried it discarded butyl carbitol inks, because butyl carbitol adversely affected the glue and glycerine ink rolls in common use.

On the defense of lack of invention, the prior art as disclosed in the patents cited and discussed (supra), state the problem to be as Gessler does; that is, by use of a solvent that keeps the ink sufficiently soft, so that it can be properly distributed on the rollers without drying and gumming up the presses, and at the same time the ink must dry out quickly so that the paper web can be printed on both sides without too great a delay in between. This calls for a solvent like that used by both plaintiff and defendant, i. e., possessing characteristics of slow evaporation with quick increase in vapor pressure at high temperatures.

It is hard to believe the selection of a slow-evaporating solvent, as called for by the art, involved the exercise of the inventive genius, especially when there were available to the trade solvents of all kinds of vapor pressure. The manufacturers were ready to develop a solvent to order of the exact type requested for the particular purpose any ink manufacturer might have in mind. For instance, butyl carbitol is manufactured by the Carbide and Carbon Chemicals Corporation, and advertised as having a very low rate of evaporation, and recommended as an excellant solvent for nitro cellulose and resins, and said to be useful where a solvent with an extremely low rate of evaporation is required.

It might well be said that a mechanic skilled in the art, in solving this problem of evaporation, would naturally think of and try the application of heat in some form— the advantages of which are stated in all the prior art patents.

It would seem, therefore, that Gessler found that his highly volatile lacquer ink, when applied to the ink-transferring rolls of the printing press and exposed to the atmosphere dried too fast, and sought a solvent that did not evaporate so fast. That is exactly what he says he did (p. 1, col. 2, lines 2 and 6 et seq.). On cross-examination (R. pp. 1030-1034), he said he tried different solvents and selected three from a long list—all of which he tried out—and finally accepted butyl carbitol.

In B. B. Chemical Co. v. Cataract Chemical Co., 2 Cir., 122 F.2d 526, the patent in question dealt with improvements in making and using a softener of dried pyroxylin cement, to be used in attaching soles of shoes to the uppers. This cement had to be of a certain viscosity, and as Judge Chase states, the problem (page 529 of 122 F.2d), was to provide a softener which would cut the dried cement sufficiently without being so volatile that it would dry before the

operator could place the parts in position in the press. The court says, page 528 of 122 F.2d: "The softening of pyroxylin, or nitrocellulose, cement could, as was well known, be accomplished by 'activating' or 'cutting' the dried cement with a thinner solution of the nitrocellulose dissolved in one or more of a number of its solvents such as acetone, ether, ethyl acetate, butyl acetate or the like. Some of these solvents were of the low boiling point, and some of the high boiling point, variety. The lower the boiling point the higher the volatility and vice versa. This was well known and, presumably, any good chemist would obtain the desired volatility by selecting the needed solvent".

Gessler said (R. p. 1032), butyl carbitol possessed the property of low vapor pressure at room temperature, and rapid evaporation when heated above 100°. This being a property of the chemical itself, it could not be the subject of a patent. So all he did was to recognize the physical property of the only solvent he named in his patent—butyl carbitol—and thus obtaining the desired volatility by picking the proper solvent. As a matter of fact neither party uses butyl carbitol in their ink.

Doughty specified the boiling range of his solvent as being between 200° and 300° C. (p. 1, col. 2, lines 69 and 72), and named several such solvents, to wit, terpineol, benzyl alcohol, terpinyl acetate, benzyl acetate, ethyl benzoate. He also recommends petroleum solvents (p. 2, col. 1, lines 16 and 20).

Butyl carbitol came on the market about 1929. Gessler testified it was his custom to keep in touch with new solvents. Thus he learned about it. So there is the question, did he by selecting one of these new solvents, exercise the inventive talent or genius? According to Judge Patterson in Kaumagraph v. General Trade Mark Corporation (U. S. Dist. Court S'n Dist. of New York)[1], affirmed in 2 Cir., 102 F.2d 992: "It was a development plainly indicated by recent prior art, a change that was inevitable sooner or later, calling for nothing beyond the skill of the calling". (Citing cases).

It would therefore seem, in the language of Judge Hand in Ruben Condenser Co. v. Aerovox Corp., 2 Cir., 77 F.2d 266, 268, that the patent in suit does not rest upon a patentable invention, but on one of those steps in an art which demand only patient experiment, the court pointing out that in chemistry it is possible to proceed by a system of trial and error. In that case the court goes on to say that invention demands " * * * something more than routine testing of obvious combinations".

Butyl carbitol has the characteristic of low vapor pressure at room temperature, with rapid evaporation when heated. The patentee merely recognized this inherent physical property of a suitable solvent—all as set out in the catalog of the Carbide and Chemicals Corporation, from which Gessler selected butyl carbitol, and which also gave its temperature range.

Doughty and Gessler both recognized that the then current inks contained solvents that evaporated too quickly and dried on the rolls. Both solved this problem by substituting a solvent that would not evaporate so quickly at ordinary temperature. But such a solvent would not dry on the paper, so a heater was specified to do that. This heater was not, and of course could not be, claimed to be new or patentable. Gessler selected butyl carbitol, while Doughty specified (p. 2, col. 1, line 12), a proper solvent should have a minimum boiling point of substantially 200° C. to avoid too rapid a drying of the ink upon the rolls. Stating further (line 16), that certain higher boiling point liquid saturated paraffin hydrocarbons, e. g., those present in fractions of kerosene boiling above 250° C. at normal pressure may be employed instead of terpineol.

Furthermore, Lefferts and Stevens, No. 280,654 (p. 2, col. 2, line 109), speak of the necessity of drying the surface after the application of color: "By means of our improved ink, when used in connection with heat and pressure, as above stated, a hard and permanent impression is produced, and the printed sheets or articles may be piled together immediately after they are taken from the press".

The very improvement claimed by Gessler.

These catalogs from which list of solvents Gessler in 1930 selected butyl carbitol on account of its boiling point, also contained full instructions for making the varnish that Gessler said he invented, p. 13 of the 1929 catalog stating that butyl

---

[1] No opinion for publication.

890

carbitol "* * * is an excellent solvent for nitrocellulose and resins".

Furthermore Gessler states in his patent (p. 1, col. 2, line 44): "The solvents or solvent mixtures utilized in the formation of these solutions may be described as solvents having a high boiling point combined with a low vapor pressure at room temperature, but yet further characterized by a rapid rise in their vapor pressure curves upon elevation of the temperature,—that is, by their property of evaporating quickly from a thin layer, as in a print, when the temperature is sufficiently raised".

Again referring to the catalogs above referred to, we find it stated in reference to butyl carbitol: "* * * is especially useful in pyroxylin dopes and other plastics where a solvent with an extremely low rate of evaporation is required".

■ What is the law of the case?

"'Anticipation' means the disclosure in the prior art of a thing substantially identical with the art or instrument for which a patent is sought. An invention is anticipated only if the invention already known or used by others in this country, or patented or described in a printed publication in this or any foreign country, is identical in substance with it". 48 C.J. § 27(2), p. 28.

■ Patents are granted to inventors or discoverers of anything new or useful "* * * not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof". 48 C.J. § 26, p. 28.

■ It is not essential in order to anticipate an invention that there be both prior knowledge and prior use. 48 C.J. § 33(3), p. 35.

"To give a prior patent effect as an anticipation it is not necessary that the invention patented should be generally known, that its existence should have been known to the latter inventor, or that the art or instrument of the patent should be commercially successful". 48 C.J. § 44(4), p. 41.

In Sirocco Engineering Co. v. Sturtevant Co., 2 Cir., 220 F. 137, page 143 (certiorari denied 238 U.S. 636, 35 S.Ct. 939, 59 L.Ed. 1500), the court, after stating that the

structure there had been patented in France said: "We do not see how, in view of the statute and the decisions, we can ignore these French patents because they were not generally known and were not commercially successful. The law does not make these features essential in considering the structures of the prior art".

■ With respect to anticipatory effect, prior patents and prior publications rest upon the same ground. No valid patent could be obtained by the inventor for his invention if it was described in a printed publication in this or any foreign country before his invention or discovery thereof.

■ A printed publication, in the view of the patent law, is anything that is printed and made accessible to any part of the public.

A trade periodical entitled "Printing Equipment Engineer", December, 1931, contains the second half of an article by one M. E. Hanson entitled "Plastic Printing Inks for Rapid Drying". This article describes the same problem that Gessler worked on, referring to such inks as "heat and ozone reactive inks", the heat to be applied to the surface of the running sheet, drying sufficiently to set the ink enough to run the other side. This article, taken as a whole, would seem to be a complete disclosure on most everything that Gessler claims in his patent, and whether he saw it or not, it is a good statement of the problem the art was wrestling with and the proper approach to the solution.

In a case such as this it has been held: "The defending party to prove his defence, which he may do by showing that the thing patented had been invented or discovered by some other person in this country prior to the alleged invention in the pending suit, or that it had been patented or described in some printed publication in this or any foreign country". Imhaeuser v. Buerk, 101 U.S. 647, at page 660, 25 L.Ed. 945. See, also, Parks v. Booth, 102 U.S. 96, 26 L.Ed. 54.

■ According to Robinson on Patents, Vol. 1, pp. 446–456, a prior patent becomes a public document when duly granted by the state and issued to the patentee, and a prior publication must be a work of public character intended for general publication, within reach of the public, published before the date of the latter invention.

The Hanson article states that if heat and ozone are used the drying is sufficient to set the ink so that no slip sheets are required, and the whole stack being dry in a few minutes, while in the case of the ordinary inks employing no heat or ozone, the drying time, according to the author, was eight to ten hours, and slip sheets were required. The author states the general characteristics for a plastic ink to be one that will not dry in a thin film exposed to room air at 80° F. for several hours, as it might be spread upon rolls or plates, but merely at a touch of heat after being printed upon the paper dries almost instantly.

The general characteristics for a plastic ink are stated to be one not hardening on the rolls at room temperature; one that when heated on the printed sheet to not over 250° F., will harden or dry in a small fraction of a second; one that will not deteriorate glue or other soft inking rolls. And: "One manufacturer has presented an ink capable of drying with a very brief exposure to heat which will remain moist on inking rolls and plates for a long time. There are many points to be worked out concerning its use as a commercial ink for magazines or newspapers. It gives great promise, however, there being little doubt as to its ultimate success if the necessary work upon it is persistently carried on to a finish".

It then points out the advantages of such an ink to be the elimination of wax sprays, slip sheets or offset paper rolls, and the ink would be less expensive. That such an ink can be dried in a foot or two of web length, and colors applied immediately upon the reverse side, and go to the folding devices at present speeds.

The author, it would seem, had correctly diagnosed the objections to the then used inks, and states the problem and the advantages of a heat-set ink, such as described, not only in the patent in suit, but in the prior art patents referred to (supra).

This discussion has been unduly prolonged. It leads us to the conclusion that the patent in suit was anticipated by the prior art patents and the publications referred to. The court is filing herewith findings of fact and conclusions of law to that effect. It is therefore unnecessary to unduly extend this opinion with a discussion of other points raised.