## GRANT PAPER BOX CO. v. RUSSELL BOX CO.

### No. 4044.

Circuit Court of Appeals, First Circuit.
Nov. 7, 1945.

Hector M. Holmes, of Boston, Mass. (Christy, Parmelee & Strickland, William H. Parmelee, and Eiffel B. Gale, all of Pittsburgh, Pa., on the brief), for appellant.

George P. Dike and Herbert A. Baker, both of Boston, Mass. (Roderick W. Hoag, of Boston, Mass., on the brief), for appellee.

Before MAHONEY and WOODBURY, Circuit Judges, and PETERS, District Judge.

WOODBURY, Circuit Judge.

This is an appeal from a judgment for the defendant in a suit for patent infringement. The issues raised are the validity, and, if valid, the infringement of claim 3 of a patent applied for by Carl G. Dreymann on May 17, 1934, and issued to the plaintiff-appellant as his assignee on February 18, 1936.

The Dreymann patent (No. 2,031,036) is for a "Composition of Matter and Method of Its Production." More specifically, it is for two sheets of paper bonded together by a film of flexible, highly moisture-vapor proof adhesive to provide a laminated paper primarily intended for use in manufacturing small folding paper boxes and cartons such as those in which various foods are packaged for the retail trade.[1] The claim in suit reads:

"A container wall for the packaging of material including a sheet or film composed substantially of an amorphous petroleum wax of an apparent melting-point of 120°–

---

[1] Its particular value for this purpose is said to be that boxes made of the patented material will keep atmospheric moisture away from dry foods, such as breakfast cereals or crackers, and will keep moist foods, such as cakes or doughnuts, from drying out.

170° F., carrying a suspended colloid, and two sheets of fibrous material, the sheet or film of said wax intercalated between the sheets of fibrous material and constituting a film of adhesive uniting the whole."

For our purposes the key words of this claim are "composed substantially of an amorphous petroleum wax * * * carrying a suspended colloid." To understand them recourse must be had to the evidence in the record since the court below filed no memorandum opinion but only findings of fact and conclusions of law.

It appears that Dreymann is a highly educated chemist who has had many years experience both in research and in manufacturing in his field. In August, 1932, he approached one Grant, the president of the plaintiff corporation, which is a folding paper box and carton manufacturing concern located in Pittsburgh, Pennsylvania, and although the two were complete strangers, he succeeded in convincing Grant that with only a little more research and experimentation he could produce a commercially practical, highly moisture-vapor proof, laminated paper suitable for manufacturing small folding boxes. Grant, recognizing as he said the commercial possibilities in such a paper, at once equipped a laboratory for Dreymann and gave him financial backing, and early in 1934 Dreymann produced a laminated paper which both he and Grant thought satisfactory. Grant at once offered sample boxes made of Dreymann's material to local banking companies, and also to the Heinz Company and the Loose-Wiles Biscuit Company. All, either by actual experimentation or laboratory test, found the samples satisfactory and placed substantial orders. Other purchasers soon followed and the plaintiff's business in folding boxes made of the patented material expanded rapidly. There is ample evidence to support the finding of the court below that the "Plaintiff's product was highly successful commercially," and the only evidence in the record is that this commercial success was due to the intrinsic merit of the product and not to advertising or the plaintiff's business methods.

Turning to the state of the art prior to Dreymann, we find that a very highly mois-

ture-vapor proof paper called "glassine" had long been known but that it is expensive, and also very thin, and so is not suitable for boxes but only for wrapping. It is comparable to cellophane. Another moisture proof paper known as "asphalt board" has also been on the market for several years. This latter, unlike "glassine", is a laminated paper like the plaintiff's, but the testimony is that it is thick and heavy and is used only for large shipping cartons. Other laminated more or less moisture-vapor proof papers were patented prior to Dreymann but none of them combine all the advantages of Dreymann's since they were either too thick and heavy or too thin and pliable for small folding boxes.[2] It does not appear whether these latter papers were used to any appreciable extent commercially or not. Also various coated papers have long been known and used, but it appears that these are greasy to the touch and cannot be written or printed upon, and some of them, particularly those coated with paraffin, cannot be folded into a box without cracking at the folds and in consequence losing their moisture proof characteristic.

It appears that Dreymann overcame the various disadvantages of the papers of the prior art for making small folding boxes. He produced a paper of a thickness suitable for manufacturing containers for cakes, doughnuts, breakfast cereals, crackers, etc., which was not only highly moisture-vapor proof, but also would not crack when folded, could be printed or written upon, and although more expensive than ordinary boxboard, was not prohibitively so. And, as already indicated, he accomplished this not by coating a single sheet of paper or cardboard, but by laminating two sheets of paper or cardboard together with a moisture-vapor proof, flexible, adhesive composed substantially of amorphous petroleum wax carrying a suspended colloid. This substance we will have to describe in some detail.

In refining petroleum by distillation first the lighter and more volatile fractions such as naptha, gasoline, lubricating oils and paraffin, which is a crystalline or brittle wax, are recovered. What then remains is

[2] See Patent No. 229,045 to Johnson (1880) for "Impervious Wrapping Paper"; Patent No. 1,269,918 to Fietsch (1918) for a "Moisture Proof Paper Package or Carton", using air blown asphalt as an adhesive; and Patent No. 1,936,375 to Beecher (1933) for "Laminated Sheet Material" consisting of two sheets of glassine bonded to make a transparent grease and moisture-vapor proof bag primarily for such products as potato chips.

an unctuous, semi-solid plastic material, usually dark brown in color, known as petrolatum. This, being residual matter, has no standardized or fixed composition or set of properties. Ordinarily it consists of substantially equal amounts of three substances, first, mineral oil, second, a microcrystalline or non-brittle as distinguished from a crystalline wax, and third, a poorly defined resinous colloidal material referred to as an impurity. But the proportions of these substances in petrolatum vary within wide limits depending upon the source of the petroleum of which the petrolatum is a residue, and upon the method used in recovering it. Thus after the mineral oil, or a substantial portion of it, has been removed, what remains may be a relatively pure microcrystalline wax or there may be included with such a wax as much as 35% of resinous colloidal material.[3] It is possible for refiners to control the amount of resinous matter in petrolatum wax "all the way * * * down to practically nothing," but they do not by any means always do so.

Until the mid 1920's amorphous petroleum wax, or petrolatum wax, (these terms are synonymous) appears to have been a waste product used by oil refiners as fuel. Then a use for it in the paper manufacturing industry was discovered. It was put into a water emulsion and used as a beater sizing to improve the finish of paper and to make it somewhat resistant to the penetration of moisture, and "scuff-proof", that is, to prevent roughening when wet, and it was also used as a coating to give paper a glaze. During the late 1920's it appeared on the market as a commercial product. But it was not then nor has it since become a standardized product.

It appears that the various refiners offer diverse types of waxes described by specifications which they establish, and customers, frequently by trial and error, determine the wax best suited for their needs and purchase accordingly. That is, the refiners, not the customers, establish the specifications for the various types of petrolatum waxes commercially available. And each refiner has different sets of specifications. Thus a great variety of petrolatum waxes are on the market. Some are hard and some are soft depending upon the amount of mineral oil extracted, and, in addition, some are almost but never quite chemically pure while others contain a very substantial amount of the resinous colloidal impurity native to petroleum mentioned above.

We are not here much concerned with the amount of mineral oil in petrolatum wax, which determines its melting point. What is important for our purposes is its purity, that is, the amount of resinous colloidal material in it, since this is the factor which appears to be vitally important if it is to be used as an agent for laminating paper.

Dreymann found by experimentation in his laboratory that a relatively pure amorphous wax, which was the only kind he had in his laboratory and so far as appears was the only kind he knew about, when melted and spread on a sheet of paper or cardboard, was almost instantly soaked up and so did not provide an adhesive film, and, in addition, discolored the paper and made it greasy to the touch so that it was unattractive in appearance and could not be printed upon. But he noted that such an amorphous wax as it cooled did not pass almost immediately from a liquid to a solid state, as paraffin does which becomes a firm solid when only two degrees below its melting point, but instead passed from a liquid

---

[3] One of the plaintiff's witnesses described the composition of petrolatum as follows: "It is my understanding that petrolatum is a term used to include a mixture of wax, petroleum residue, which I could not attempt to identify, and oil. In its natural state, petrolatum, as I think a previous witness has testified, is a jelly-like substance. We all know it as vaseline. As the oil is removed from the petrolatum we get what is known in the trade as petrolatum wax, which I indicated is synonymous with amorphous wax or microcrystalline wax. The more oil you remove from the petrolatum the higher the melting point, and the harder the petrolatum wax is going to be, or the amorphous wax is going to be. That wax obviously contains the wax that was in the petrolatum together with the petrolatum residue in various proportions, probably depending upon the source from which the petrolatum was derived. It is that residue that makes the wax amorphous. In other words, if the residue was not there the wax would be crystalline, the same as paraffin wax. I think it has been fairly well established in the literature that pure petroleum waxes are all crystalline, they will all crystallize, and the difference between amorphous wax and the crystalline wax is the presence of a petroleum residue which inhibits the crystallization, thus rendering the wax amorphous. That is my understanding."

into a semi-solid or plastic state in which it was very sticky, and then solidified at a temperature approximately five degrees below its melting point. Dreymann realized that this characteristic of the wax was important for laminating purposes so he set about to develop it, and this he found he could do by blending the wax with various resinous colloidal substances foreign to petroleum.[4] In this way he prolonged the plastic stage of the cooling process, the stage during which the wax was neither a liquid nor a solid and was very sticky, over the time required for the wax to drop about 25 degrees below its melting point. In other words, he found that a resinous colloid in suspension in an amorphous petroleum wax delayed its solidification and gave it increased "tackiness." And this made it suitable for laminating paper, because when the wax, at slightly above its melting point, is spread in a film on a cooler sheet of paper it at once gels (becomes semi-solid, or plastic) and in this condition does not penetrate the paper enough to cause discoloration or to make the paper greasy but instead penetrates the paper only enough to adhere to it, and then remains sticky long enough to permit another sheet of paper to be superimposed, thereby bonding the two sheets firmly and permanently together.

The defendant-appellee, a Massachusetts corporation doing business in Medford in that Commonwealth, is, like the plaintiff-appellant, a folding paper box and carton manufacturing concern. A little later than Dreymann it began experimenting with petrolatum waxes as laminating agents for paper and in 1935 or 1936 it produced a commercially successful moisture-vapor proof paper suitable for small folding boxes. Its business in such boxes appears to have been successful.

But it did not solve the problems inherent in the use of petrolatum wax as a bonding agent for paper by scientific laboratory methods as Dreymann did. It proceeded by trial and error. Realizing that petrolatum wax was non-brittle, moisture-vapor proof and sticky as it solidified, as anyone would who was familiar with it, the defendant-appellee purchased some on the market and tried to laminate with it. The first wax tried proved unsatisfactory and so did the second, but the third, known commercially as Benowax C, worked. This wax, the court below found, has about the same resinous colloidal content as that used by the plaintiff, that is, about 25%, but its resinous colloidal content is that native to petroleum, whereas, as already appears, that in the plaintiff's wax is not. The evidence, however, is that for laminating purposes it makes no difference whether the resinous colloidal element in a petrolatum wax is native or foreign to petroleum provided it is present in the requisite amount.

Thus in summary the facts are these. The patentee, by a process of scientific reasoning and laboratory experimentation determined that petrolatum wax could be used for laminating paper only if it was combined with a resinous colloidal material, and then he proceeded to make the combination by adding such a material to a relatively pure petrolatum wax, the only such wax he knew. The defendant on the other hand, observing that petrolatum wax had certain characteristics which made it seem useful for laminating papers, i.e., that it was flexible, highly moisture-vapor proof and adhesive when plastic, tried several commercial waxes until he found one that served the purpose, and this wax turned out to contain a resinous colloidal impurity native to petroleum in about the amount that the plaintiff somewhat earlier had found essential. The resinous colloidal matter left by the refiners as an impurity in the wax used by the defendant serves the same purposes in laminating paper as the resinous colloidal matter foreign to petroleum added to the relatively pure petrolatum wax used by the plaintiff.

The court below did not pass upon the validity of claim 3 of the Dreymann patent. Finding that the defendant's wax was that described in a rejected and thereafter abandoned claim of Dreymann's original patent application, its conclusion was that the plaintiff was estopped by the file wrapper from asserting that the defendant had infringed. Stated in more detail, the court below concluded that claim 9 of Dreymann's original application, as amended, covered the use as a laminating agent for paper of petroleum wax to which nothing foreign to petroleum had been added, so that, when this claim was rejected by the Patent Office and the patentee cancelled it instead of appealing, he dedicated the use of such a wax for that purpose to the public. We cannot adopt this disposition of the case.

---

4 Esther gum, aluminum stearate and coumarone resin are suggested in the patent.

Abandoned claim 9 originally read: "A container wall for the packaging of material including a sheet or film formed of amorphous substantially saturated petroleum derivative." Then, after rejection on prior patents, it was amended by the patentee in March 1935, to read: "A container wall for the packaging of material including a sheet or film composed substantially of amorphous petroleum wax of a melting-point of 120°–170° F." In this form it was rejected by the Patent Office on the patent to Beecher mentioned in footnote 2 supra, and on August 9, 1935, the patentee cancelled it.

It seems to us that this claim as amended, instead of covering just amorphous petroleum wax to which nothing foreign to petrolatum has been added, covers amorphous petroleum wax regardless of its resinous colloidal content, be that content native or foreign, and that so construed it is broader than the invention disclosed. We do not agree with the plaintiff that amended claim 9 is so broad as to cover every use of the wax in a container wall for the packaging of material, even its use as a coating or for impregnating. Reading the abandoned claim in conjunction with the specification we think it would have to be limited to cover only use of the wax as a laminating agent. But even so limited it is still too broad because, as already appears, amorphous petroleum wax alone is not a standardized material having a fixed set of properties—it may or may not carry an appreciable amount of resinous colloidal impurities—and the patent as a whole is not for amorphous petroleum wax in general as a laminating agent for paper, but is only for such a wax for that purpose in combination with a substantial quantity of resinous colloidal matter  We think anyone reading the specification would have to conclude that an amorphous wax without at least a substantial colloidal content was unsuitable for the purpose the patentee had in mind. Thus abandoned claim 9 as amended does not read on the application and was properly rejected and cancelled for that reason, not because it claimed an amorphous wax to which nothing foreign to petroleum had been added, and from this it follows that the plaintiff is not estopped by the file wrapper.

This brings us directly up to the issues of validity and infringement and face to face with the question of which issue to consider first.

The courts have frequently said, obviously correctly, that an invalid patent cannot be infringed. Logically then the question of validity should be considered before the question of infringement. But in Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450, the Supreme Court said: "To hold a patent valid if it is not infringed is to decide a hypothetical case," and logically to hold a patent invalid if not infringed is also to decide a hypothetical case. See Hale v. General Motors Corporation, 1 Cir., 147 F.2d 383, 388. From this it would seem to follow that the question of infringement should be considered first and the question of validity considered only if infringement is found. In this logical dilemma the courts have wisely taken a practical course. They have decided cases of this sort, whenever they must be decided against the plaintiff, on whichever issue must be resolved against him, subject, however, to the qualification that sometimes, even when a patent is not infringed, it is proper to go further and in the public interest to declare a patent invalid if in discretion the circumstances presented make such a course seem appropriate.[5] Bresnick v. United States Vitamin Corporation, 2 Cir., 139 F.2d 239. Cf. Hale v. General Motors Corporation, supra.

These considerations induce us to dispose of this case on the issue of validity since we feel constrained to hold claim 3 of the plaintiff's patent invalid for lack of invention on the authority of the Sinclair & Carroll case cited in footnote 4 supra.

Dreymann may not be a genius, but nevertheless his mental process in devising the laminated paper described in his patent was inventive. He was aware of the problems inherent in making a relatively thin,

---

5 See also Sinclair & Carroll Co. Inc. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 1145, in which it said: "There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent.

(Citing cases.) It has come to be recognized, however, that of the two questions, validity has the greater public importance, Cover v. Schwartz, 2 Cir., 133 F.2d 541, and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent."

moisture-vapor proof, flexible boxboard, and he found a solution for these problems by patient and skillful scientific research and experimentation. Moreover he made a substantial contribution to the progress of his art as the commercial success of his product and its acceptance by a substantial part of the industry testify.[6] Nevertheless the test of invention is not subjective but objective and what Dreymann actually did, in spite of his research and labor, was only to discover that a commercially available material, amorphous petroleum wax carrying a suspended colloid, provided a suitable laminating agent for paper. In effect he only found a new use for a material in the public domain.

Now this, as the plaintiff points out, does not necessarily negative invention. It does so only when the discovery of the new use is what might be expected of workers skilled in the art involved. Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 494, 23 L.Ed. 952. But even if we concede that those skilled in the art of making folding paper boxes would not be expected to discover that amorphous petroleum wax carrying a suspended colloid could satisfactorily be used to bond paper, as they apparently did not, still we would feel bound to hold the patent in suit invalid.

The patent in litigation in Sinclair & Carroll Co., Inc. v. Interchemical Corp., supra, was for a printing ink that would dry slowly at room temperatures, and so would not dry out on the rollers of a printing press, but would dry quickly at elevated temperatures. As a result it could be used to print one side of a glossy non-absorbent paper, and then dried rapidly by passing the printed sheet over a heated roller, so that the other side of the sheet could be printed immediately, instead of after hours of waiting as formerly, without causing smudging or "offset" printing on the side of the sheet first printed upon.

The District Court found this patent invalid for anticipation, 50 F.Supp. 881, and the Circuit Court of Appeals reversed, 2 Cir., 144 F.2d 842, finding the patent both valid and infringed. On certiorari the Su-

preme Court reversed the Circuit Court of Appeals on the ground of lack of patentable invention and did this in spite of evidence that the ink filled a need long felt by printers, which would seem pretty clearly to indicate that its discovery was beyond the competence of workers skilled in the art. The Supreme Court based its conclusion on the fact that the solvent used to give the ink its new and desirable characteristic was a well known chemical available commercially, the salient property of which (slow drying at room temperatures and fast drying at elevated temperatures) was described in the catalogue of a dealer in chemicals. It said: "Reading a list and selecting a known compound to meet known requirements is no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention."

We concede that the patentee in the case at bar was called upon to do more than read a list and select a known compound. He was called upon either to make inquiries of persons familiar with the petrolatum wax of commerce or to experiment with it. But had he done so he would have found out what appears to have been generally known by refiners, dealers in petrolatum wax and chemists familiar with petroleum, that is, first, that many amorphous petroleum waxes on the market carried substantial amounts of resinous colloidal impurities in suspension, and second, that this resinous material interfered with the crystallization and congealing of the wax causing it to form a slowly congealing so-called gel at temperatures slightly below its melting point. Thus, those characteristics of amorphous petroleum wax carrying a suspended colloid which make it suitable for laminating paper being both known and discoverable upon inquiry, (the patentee's ignorance of those characteristics, and apparently he was ignorant of them, are, of course, immaterial) we see nothing for it in view of the Sinclair & Carroll case but to hold claim 3 of the patent in suit invalid for lack of patentable invention.

The judgment of the District Court is affirmed without costs.

---

[6] The evidence is that the plaintiff-appellant licensed eight other folding paper box manufacturers, most of them large concerns, and that they with the plaintiff-appellant produce about 60% of the boxboard of the type here under consideration.