## PFANSTIEHL CHEMICAL CO. v. AMERICAN PLATINUM WORKS et al.
### No. 7944.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 16, 1942.

Decided March 30, 1943.

Rehearing Denied May 17, 1943.

172

Lum, Fairlie & Wachenfeld, of Newark, N. J. (Ralph E. Lum, of Newark, N.J., of counsel), for American Platinum Works.

Frederick P. Randolph, of New York City (Theodore S. Kenyon and Douglas H. Kenyon, both of New York City, of counsel), for Hecking and O'Brien.

Charles J. Merriam, Chicago, Ill. (Russell Wiles, of Chicago, Ill., on the brief), for appellee.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This is an action for a declaratory judgment that Hecking patent No. 1,909,616 is invalid for anticipation and lack of invention and that plaintiff, Pfanstiehl Chemical Company, and its licensees are not infring-ing that patent. The defendant, Hecking, was the purported inventor in the patent interest which was issued to and is jointly owned by Hecking and the co-defendant, O'Brien. The American Platinum Works, the exclusive licensee of the patent by an agreement made in 1933, is also a defendant. The lower court found the Hecking patent invalid and this appeal was taken by defendants.

The patent recites that it "relates to improvements in pens, pen-points and processes of making same". Pens[1] used in fountain pens must be made of acid and rust resisting metal if they are to be efficient. These metals are, however, for the most part too soft for long and continued wear. In order to overcome this difficulty the pen must be provided with a pen-point of hard, wear-resistant metal. Iridium or an alloy known as "iridium composition" is used for this purpose. This metal is available to the trade in the form of tiny granules, irregular in shape and size. Prior to the time of the patent in suit the process for affixing an iridium granule to the nib of a pen and obtaining a smooth writing pen was both laborious and expensive. The pen blank was made with an oversized nib and an oversized iridium granule was secured at its tip which was notched. The pen blank was then rolled out to the desired thinness and length, cut to the desired shape, pierced, and "raised" into the customary arched form. The nib and granule were then slit longitudinally. The pen-point was trimmed or ground to make various smooth surfaces and to round off the corners formed until the desired shape of the pen-point was attained. The entire pen was then smoothed by polishing or tumbling.

Hecking's patent describes a change in the method of manufacture. The iridium granules are preformed by fusion into small spheres or balls. One of these is then secured to the notched nib of a pen blank, now no longer oversized, and the resultant pen-point and nib are slit. Since neither the nib nor granule is oversized, the only grinding now necessary is that which is required to round off the edges of the pen-point at the slit.

The typical claims of the patent fall into three categories: the process, the preformed pen-point and the product.

---

[1] As used in this opinion "pen" refers to that portion of a fountain pen which is generally called the "pen-point". "Nib" refers to the pointed part of a pen. "Pen-point" refers to the tip placed on the nib of a pen.

## The Product.

This is described in claim ten as follows: "10. A pen comprising a pen body having a split and pointed outer end; and a pen point secured to said end and comprising two substantial halves of a shot-like body centrally split, said halves having curved and hard writing surfaces."

The pen described in this claim does not differ sufficiently from pens made by the old process to render it a new article of manufacture. This is self evident from the recital in the patent referring to the then existing method of manufacture and the pens produced thereby.[2] Under either process, the product consists of a metal pen, nib and pen-point of hard and durable quality. There are slight differences. The bond formed between the pen-point and the nib is firmer. Some of the pens produced by the old method were "scratchy"; the pens as described by Hecking in his application are uniformly smooth writing. However, smooth writing pens were also produced by the old method. Hecking's pen can be adapted for use as a reversible pen. The same could be done with prior pens, although the operation was expensive. The pen-point on the Hecking pen has a spherical surface,[3] whereas the surface of a pen-point prior thereto consisted of numerous flat faces with corners rounded off. These are but slight differences of degree and uniformity. Fundamentally the pens produced by either process are the same. Since Hecking's product is not a new article of manufacture, the product itself is not patentable, even though the process by which it is manufactured may be different. In re Wood-Paper Patent, 1873, 23 Wall. 566, 23 L.Ed. 31; Risdon Iron & Locomotive Works v. Medart, 1895, 158 U.S. 68, 83, 84, 15 S.Ct. 745, 39 L.Ed. 899.

## The Preformed Pen-Point.

Typical of the claims regarding the preformed pen-point is number eight. It reads as follows: "8. A body adapted to be split to form complementary portions of a pen point, said body comprising a small shot-like superficially hardened body of non-corrosive metal having a smooth polished curved surface."

The crux of this claim is the reference to a "shot-like" body, with certain described qualities, to be used as a pen-point. Admittedly invention does not lie in the discovery of a "shot-like body" or small metal sphere. The evidence, apart from common knowledge, amply shows that these were well known long before the patent.[4] No particular method for forming these is claimed except that in the patent reference is made to "fusion" as an available method. At the trial one of defendants' witnesses, the manager of American Platinum Works, testified that the process of making the metal spheres varied and that the current method employed by his company was a business secret. Fusion, as a method of making small metal spheres, is an old process and is admitted by appellants to be a known "natural law." The characteristics of the product, "superficially hardened", "smooth polished curved surface" were attributed by defendants' expert to any "small pellet, pressed powder or a granule of metal" which was fused and allowed to solidify quickly.

The only possible basis, then, for invention in this claim is in the use to which the object described is put, a pen-point. However, the use of a spherical metallic pen-point is not new. A German patent[5] and a Swedish patent[6] describe pens with ball-like pen-points, although, as found by the trial judge, neither shows a preformed pen-

---

[2] "As heretofore manufactured, gold pens tipped with the material known in the pen-making trade as 'iridium' or 'iridium composition' have been provided with tips of varying irregular shapes and configuration, and in order to provide a smooth writing surface these tips of irregular shape were necessarily slit and then held in order to be trimmed or ground on opposite sides, at front and rear and on top to bring the iridium tip portion into a conformation substantially like a frustum of a pyramid with the top corners rounded."

[3] This feature is not new however, as shown by the instances mentioned in the following portions of this opinion.

[4] For instance, small metal spheres were employed in the writing instruments of Lambert (see f. n. 7, infra) in 1892 and Parkinson (see f. n. 8, infra) in 1921. One Baker and Company sold, prior to the Hecking invention, sparking points or electric contacts which were small metal spheres of a diameter from .05 to .25 of an inch. Small metal spheres had been produced by fusion.

[5] Hewitt, German Patent, No. 27,262 (1883).

[6] Aberg, Swedish Patent, No. 23,669 (1906).

point, since in both the pen-point and nib consist of one piece of metal. An English patent [7] and an American patent [8] show a metal ball or sphere, mounted to revolve freely, for use as a pen-point, the former patent suggesting that the ball may be of platinum or other non-corrodible metal. Although none of these patents is for a "body adapted to be split to form complementary portions of a pen point," the use of a shot-like body as a pen-point is common to all of them. The claim to a "body adapted to be split" is in and of itself not invention since this was true of the iridium granules used before the Hecking patent and would be true of any pen-point made of a metal which could be cut. Our conclusion is that this claim of the patent clearly does not amount to invention.

### The Process.

Finally, there is involved the portion of the claims pertaining to process. Typical of these is number four which reads: "4. A process of pen making which comprises first forming by fusing a shot-like body having an operative writing surface, then securing said body to a pen, and finally splitting said body."

It is apparent that the process claim lists three steps. The first is the formation of a shot-like body by fusion. Our previous discussion of this feature of the purported invention, shows that it was no new discovery. The last step described is that of splitting the pen-point and nib. However, Hecking's patent itself states that this had been the prior practice in pen manufacturing. Thus, if invention is to be found in the process claims, it must be in the intermediate step, the procedure of affixing a shot-like body, the preformed pen-point, to the nib of a pen blank.

The patent in question, however, claims no new method of attaching the pen-point to the nib. In fact, no method at all is specified. The prior practice, it will be remembered, also consisted of affixing a granule to the nib of a pen. What is different here is the substitution of a small preformed sphere for the former irregular-sized granule. On this departure from prior practice rests the entire process claim. However, we fail to see how this amounts to invention. The process remains in sub-

stance and theory as it was before. A pen of softer metal is given a hard point by attaching to it a piece of harder metal.

The trial court found that the Hecking development has been a factor in making available to the public inexpensive fountain pens having satisfactory, spherical, writing points and capable of wearing for five years or more. Figures were also stated as to the large number of pen-points manufactured. Commercial success is a factor to be considered where the issue of invention is in doubt; not where it is otherwise clear that invention is lacking. 1 Walker on Patents (Deller's Ed.1937) § 44.

We think that the lack of invention here is clear. Hecking's unnovel use of materials, in themselves not the result of invention, to form a pen not different from those being manufactured at the time, was, as the trial judge stated, "not invention but merely an instance of that dexterity which one skilled in the art would naturally resort to."

The decree of the District Court is affirmed.

BIGGS, Circuit Judge (dissenting in part).

The majority conclude that Hecking's patent discloses and claims nothing of patentable novelty. I think that this conclusion is erroneous.

Hecking's patent discloses and claims a pen, a pen point and a process for manufacturing them. His pen consists of a pen nib on which is fastened a preformed "completely spherical" or "shot-like" body of hard material such as iridium. This shot-like or spherical body takes the place of the pen point as theretofore known to the art.

An iridium tip fastened to a pen nib to form a pen point was a product old in the art. It was the practice to select grains of iridium as nearly suitable in shape and size for pen points as could be found. The iridium grain was embedded in the gold at the end of the pen nib and then was slit and ground. " * * * the end, front, the top and the back and all the corners" of the hard metal point were ground off. The finished point had a "table top flat writing surface with the corners rounded off".[1]

[7] Lambert, English Patent, No. 21,747 (1892).

[8] Parkinson, Patent, No. 1,373,146 (1921).

[1] Hecking, testimony record pp. 153, 154.

The grinding was a laborious and expensive process.

Hecking got the idea of using spheres of iridium preformed by surface tension. Surface tension will cause small particles of molten metal to "crawl" into balls or shot-like shapes. The use of the principle of surface tension to form shot-like or spherical bodies was well known, but as I have indicated Hecking made his pens by fastening these preformed spherical points to pen nibs. He thus eliminated grinding or polishing and the finished product consists of nothing more than the pen nib with the ball fastened to it, slit as was usual in the art. The result is what Hecking refers to in his pen claims as "A pen comprising a pointed and formed metallic blank having * * * fastened thereto at the pointed end a writing point composed of a preformed body of hard metal of completely spherical shape, the said pen having a slit * * *." [2]

An examination of the prior art indicates that it is a far cry from its disclosures to those of Hecking. Wiley's United States Patent, No. 228,427, of 1880, discloses a process for mixing commercial iridium with a small proportion of platinum and fusing the two metals "into globules of the desired size". Wiley then "sweated", i. e. welded the globules to pen nibs but thereafter ground them down and finished them "in the ordinary way". This is not the Hecking product which requires no grinding. Wiley's patent was in fact a paper patent which has lain dormant for thirty years in the art. Wiley did not anticipate Hecking.

The court below largely relied on the disclosures of the United States Patent to Kegrize, No. 744,557 of 1903, because the figures of the illustration accompanying that patent showed a ball point sweated to the end of a pen nib. This was nothing more than an over-simplification of the patent's specification by the draftsman who made the drawings. Though Kegrize's patent calls for and claims an iridium tip or writing point, there is nothing in the patent which discloses that the iridium tip was to be preformed into a spherical body. The majority of this court do not rely on Kegrize.

Hewitt's German Patent No. 27,262 of 1883 and Aberg's Swedish Patent No. 23,-669 of 1906, do disclose "pens with ball-like pen-points", although as the majority opinion points out and as the trial judge found, neither patent discloses a preformed pen point since the pen point and nib were to be formed from one piece of metal. There is no anticipation of Hecking by Hewitt or Aberg.

The majority opinion really rests on Lambert's British Patent No. 21,747 of 1892, and Parkinson's United States Patent No. 1,373,146 of 1921. Lambert does disclose "A spring-pressed revolving ball [for the nib or needle of the fountain pens of that date] partially enclosed in a cap or casing * * *, the ball protruding from said casing sufficiently to come in contact with the writing surface by which it is caused to revolve as specified". Lambert states that the ball may be made of "vulcanite or of platinum, or other noncorrodible metal". The illustration accompanying the specification illustrates how far Lambert is from Hecking. A revolving ball inserted in a socket and kept in place by a spring device is not the equivalent of Hecking's ball point fastened to a pen nib. I think that it may not be said justly that Lambert anticipates Hecking.

Parkinson discloses a ball point held in place by another and larger ball placed just behind it, all held in position by a plunger with a powerful spring.

Neither Parkinson nor Lambert disclose or suggest the fastening of the ball to the end of a pen nib. Their disclosures make no references to pen nibs and the use of pen nibs was not contemplated by them. Parkinson's and Lambert's ball points are not to be split as are Hecking's spherical points. As a matter of fact if Parkinson's and Lambert's ball points were split they would become inoperative. Both Parkinson's and Lambert's patents are paper patents.

In the long and detailed article "Reservoir, Fountain and Stylographic Pens" appearing in the Scientific American Supplements in evidence, in which the whole art of pen making is reviewed, pens similar to Hecking's product are not even suggested. Lambert's device is referred to but these references [3] are very brief and his contributions to the art apparently are not considered to be of greater importance than

---

[2] See Claim 1 of the Hecking patent.
[3] See J. P. Maginnis Reservoir, Fountain and Stylographic Pens Scientific American Supplements 61:25,344—6 April 28, 1906.

those of his predecessor, Loud.[4] Loud's writing instrument had a ball head held in an aperture at the end of the instrument by two smaller balls, all being kept in place by a plunger and spring. Loud's ball like that of Lambert was not slit. It is interesting also to note that in another article, "The Twentieth Century Pen" in the last Scientific American Supplement in evidence, dated December 20, 1906, reference is made to an iridium point pen but the iridium point "is [to be] coated with a cream of borax which is ground in water". Parkinson is the lineal descendant of Lambert and Loud. Hecking is in fact unrelated to Parkinson, Lambert and Loud.

In retrospect Hecking's idea seems simple but I think that that simplicity has the touch of genius. What Hecking disclosed revolutionized the making of pens for fountain pens. He aided greatly in arriving at the present-day cheap long-lasting fountain pen. Pens covered by certain claims of his patent have achieved tremendous commercial success. In my opinion, the majority of the court adopts too strict a test in the case at bar.

I think that claims 1, 2, 3 and 13 of the Hecking patent are valid. The other product claims are invalid because they do not claim a preformed body of hard metal of completely spherical or shot-like shape. The specification so clearly deals with iridium or other hard metal points that the claims of the patent should be so limited. The process claims are invalid for the same reason. If Hecking had qualified the word "body" (first occurrence) used in claim 4 with some descriptive clause such as "iridium or similar hard metal" preceding the adjective "shot-like" I should consider that claim 4 was valid. Claim 5 is invalid for the reasons stated and for a further reason. It is too indefinite since it refers to "fusing a point body", without claiming any degree of fusing. This might result in bodies which were not completely spherical or shot-like. Claim 6 is invalid since it suffers from the vices of claims 4 and 5 but to a greater degree.

The issue of infringement must be decided against the appellants. Pfanstiehl creates by its Process "A"[5] small spheres of iridium formed by fusion. These, in many instances are sold to Goldsmith Bros. Smelting and Refining Company, which in turn sells them to pen manufacturers who affix the iridium spheres to pen nibs. None the less there is grinding or tumbling of the Pfanstiehl spheres before they are affixed to pen nibs. This grinding or tumbling was described even by Pfanstiehl himself as "mild", but Hecking's specification states that his preformed points are in such a condition that " * * * substantially all grinding is eliminated." I think that "mild" grinding or tumbling is not the equivalent of substantial elimination of all grinding. Hecking's invention is not so basic as to require a broad interpretation of his specification and claims. Pfanstiehl's Process "C",[6] the powdered metallurgy process,[7] does not create spherical iridium points which, where mounted on nibs, form pens which fall within the scope of Hecking's valid product claims. The iridium points formed by Process "C" frequently are not spherical at all and the points formed by the process, even when almost shot-like, require grinding or tumbling.

I conclude therefore that part (I) of the decree of the court below should be reversed to the extent indicated; that part (II) of the decree should be affirmed as should part (III) also.

---

[4] See pp. 25, 345—6 of the Scientific American Supplements supra.

[5] So designated in the record and upon the briefs.

[6] So designated in the record and upon the briefs.

[7] This is a process in which grains of iridium are thrust into a rubber pressing die and subjected to great pressures. The grains are then taken from the die and sintered to the pen nibs. A fusing process is sometimes used to aid in perfecting the points.