## INTERCHEMICAL CORPORATION v. SINCLAIR & CARROLL CO., Inc.
### No. 336.

Circuit Court of Appeals, Second Circuit.

Aug. 28, 1944.

Writ of Certiorari Denied Dec. 11, 1944.

See 65 S.Ct. 278.

Robert W. Byerly and Ralph M. Watson, both of New York City, for plaintiff-appellant.

Hoguet, Neary & Campbell, of New York City (Walter H. Free, of New York City, of counsel), for defendant-appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a patent suit brought by the Interchemical Corporation, assignee of U. S. Patent No. 2,087,190 to Gessler, against Sinclair & Carroll Company, Inc. Claims 3, 10, 11, 12 and 13 are in issue. The District Court held the patent invalid and not infringed as to those claims. The plaintiff, Interchemical Corporation, appeals. We think that the claims are valid and infringed and that the decree should, therefore, be reversed.

The Gessler patent is for a printing ink and is directed to the composition of the ink and not to any method of printing. The great advantage of the Gessler ink is that it enables printing to be done on high grade non-absorbent paper with a smooth surface very rapidly and without smudging. The ink used is a volatilizable ink and differs from the inks which were in general use for printing formerly and are still widely employed, the liquid part of which is linseed oil. Linseed oil cannot be volatilized and will only harden after a considerable time by absorbing oxygen from the air—a slow process requiring many hours for completion. In printing newspapers the drying of a linseed oil ink was not difficult because the soft paper used absorbed the ink when one side of the paper was printed and held it in position until after the back side of the sheet was printed in spite of the fact that the ink on the front side had not dried.

A different problem arose in printing on the smooth non-absorbent papers which are used for magazines. Such papers will not take up and hold the ink and the wet ink printed on one side is likely to be smudged by the ink on the other side. It was at first sought to correct this difficulty by running a separate web of "treated manila" through the press underneath the web of the paper that had been printed for the purpose of protecting the wet ink on the first side at the time when the second impression was being made. There were various other attempts to prevent smudging when linseed oil was used in the ink and at the same time to maintain a high speed in printing, but it remained impossible to print on smooth paper in a high speed press until an ink was discovered that would dry instantly when the proper time arrived. We think this discovery was made by Gessler. He discontinued the use of linseed oil in his ink and demonstrated the advantages of an ink that would volatilize rapidly instead of slowly oxidizing and would also retain its original consistency unchanged during its travel over a long series of ink rollers.

Volatilizable inks had before been used in rotogravure printing in which the ink was deposited on the paper from engraved recesses in the printing cylinder. But it was unnecessary in that process to maintain the original consistency of the ink unchanged while it was passing over a long series of rollers. The rotogravure cylinder rotates through a trough of ink, a steel doctor blade scrapes the excess ink off and the balance that is in the pockets below the surface is transferred onto the paper. As the witness Cray said there is "no question of rollers at all" (Record, p. 97). Metallic inks which were dried by evaporation had likewise been used for stamping letters on book bindings. These inks, like those used in the rotogravure process, contained no linseed oil but had a solution consisting of a solid binder such as resin dissolved in a liquid solvent which boiled off at the temperature to which the printing die was heated.

We think the record clearly establishes that the trade had long striven to secure an ink that would maintain its consistency on the rollers until the web was imprinted and would then instantly dry on application of a sufficient amount of heat but had never succeeded in obtaining such an ink until Gessler made his invention. As a result his ink has been widely used on high speed printing presses and is regularly employed in printing such magazines as the "Saturday Evening Post," "Life," the "New Yorker" and "Colliers."

The specification of the Gessler patent refers to the delay in drying the ink and the difficulty in avoiding smudging where inks had been made with oils. It then re-

fers to the use of cellulose lacquers having such a high degree of volatility that they hardened on the rollers of the press and failed to make a "satisfactory impression * * * on the material to be printed." Gessler describes his invention thus:

"I have discovered * * * that if * * * cellulose compounds, particularly nitrocellulose, are dissolved in solvents with high boiling points, this difficulty may be avoided. * * *

"The referred to solutions, * * * are characterized by their very low rate of evaporation at temperatures approximating room temperature and by their ability to manifest a relatively high degree of volatility when subjected to temperatures higher than room temperature. The solvents or solvent mixtures utilized in the formation of these solutions may be described as solvents having a high boiling point combined with a low vapor pressure at room temperature, but yet further characterized by a rapid rise in their vapor pressure curves upon elevation of the temperature,—that is, by their property of evaporating quickly from a thin layer, as in a print, when the temperature is sufficiently raised. Among this peculiar class of solvents I have found as an example diethylene glycol monobutyl ether to be a solvent for nitro-cellulose and many natural and artificial gums, very well adapted to the purposes of this invention. This solvent at room temperatures remains fluid and moist for a long period of time. When heated to about 100° C. or above, the rate of vaporization is greatly accelerated and, when used in the ink of this invention, produces a print which dries almost instantaneously when subjected to such a heat treatment.

    *    *    *    *    *    *.

"With ink prepared as above, the printing operation may be carried out in the ordinary manner and at ordinary temperatures. At the conclusion of the printing operation, the printed materials may be subjected, in known manner to sufficient heat to dry the thin film of the print very rapidly. Thus a finished print is obtained immediately at the end of the printing and heating operation and no time, labor, nor material is wasted in delays incident to the prolonged drying of the printed goods under the processes at present in use."

The third claim which contains the important elements of the others in suit reads as follows:

"3. A printing ink which is substantially non-drying at ordinary temperatures and dries instantly on heating of the printed matter, consisting of coloring matter dispersed in an organic viscous vehicle consisting of a liquid component and a solid component completely dissolved in the liquid component in sufficient quantity to give the ink the consistency of an ordinary oil-varnish printing ink—the solid component being a member of the group consisting of natural and synthetic resins and cellulose compounds, substantially all of the liquid component having a vapor pressure at 20° C. as low as that of diethylene glycol monobutyl ether at 20° C., and the major part of the liquid component having a vapor pressure which at 150° C. approximates that of ethyl alcohol at ordinary temperatures and forming a stable solution with the solid component."

The claims of the patent in suit, which are relied on, were held by the District Court to have been anticipated by:

Lefferts and Stevens U. S. Patent No. 380,654, April 3, 1888

Doughty U. S. Patent No. 1,439,696, December 26, 1922

McElroy & Clarke U. S. Patent No. 1,450,692, April 3, 1923

Jirousek U. S. Patent No. 1,954,627, April 10, 1934

Hanson Article of December, 1931.

### The Lefferts Patent

This is an old patent issued in 1888 and, therefore, a most unlikely reference in an art which shows a vain striving for many years thereafter to obtain a quick drying ink for ordinary printing. The Lefferts patent disclosed oil of cassia as a solvent. It was a natural mixture coming from the interior of China. There is no proof of what its vapor pressure was at the time when Lefferts applied for his patent. In other words, it was not a standard product and this is evident from the great variation of the vapor pressure of some of the samples of oil of cassia purchased in 1938 from the vapor pressure of butyl carbitol and the substantial correspondence of the vapor pressure of samples purchased in 1942. There is nothing in the Lefferts patent to show the critical vapor pressure of his solvent at room temperature or at temperatures at which it would vaporize. He says that for type printing the ink should be "of a slow drying nature", but does not say

how slow. Nitro-benzole is also mentioned in the Lefferts patent among proposed solvents, but defendant's expert admitted that its vapor pressure is at least ten times that of butyl carbitol (Record p. 332).

## Doughty and McElroy & Clarke Patents

These patents related to metallic pigment inks for application to bookbinding by means of a heated die. The inks were to take the place of the old process of affixing gold leaf. The metallic pigments were dispersed in a solvent of terpineol combined with a resinous substance as a thickening agent. Doughty in his specification says:

"The ink dries very slowly at atmospheric temperature owing to the high boiling point of the volatile solvent. It dries rapidly, however, when applied with a heated die. * * * The ink described, though particularly suitable for book-binders' use, will serve other purposes of decorative printing."

Satenstein, the president of Alchemic Gold Company, testified that the ink was only used for stamping and was not satisfactory for ordinary printing. His company was an assignee of the Doughty and McElroy & Clarke patents, and sold them to Frederick H. Levey & Company, reserving however to itself the right to manufacture, sell and use them in stamping as distinguished from letter press and intaglio printing. The purchase of Levey & Company of rights under the Doughty patent was after it had succeeded in making an ink derived from the teachings of Gessler but which it hoped did not fall within the claims of his patent.

The terpineol which Doughty and McElroy & Clarke described as their solvent had a vapor pressure two or three times as high as that of butyl carbitol. When appellee made a test to prove the advantages of the Doughty and McElroy & Clarke inks he used 33⅓% of terpineol and 66⅔% of resin oil instead of the 95% of terpineol and 5% of resin oil recommended by McElroy & Clarke.

It is true that Doughty mentioned terpinyl acetate as among suitable solvents and that solvent has the same vapor pressure as butyl carbitol. But there was nothing in the patent to indicate that the vapor pressure of terpinyl acetate should be chosen for a quick drying ink for ordinary printing and the specification did not and could not indicate any satisfactory formula for such printing that would at once embrace this ingredient and terpineol which differed so widely in vapor pressures.

We cannot regard these patents which had contributed nothing to the ordinary printing art though they had issued about ten years prior to the Gessler patent as references that ought to defeat his invention.

## The Jirousek Patent

This patent provides for an ink containing a large amount of linseed oil and clearly is not a proper reference against the Gessler patent.

## The Hanson Article

This publication described the kind of ink desired by printers but not the way to get it or its composition.

Other patents discussed in the defendant's brief were U. S. Patent No. 1,752,462 to Smith, U. S. Patents Nos. 1,858,673 and 1,954,450 to Lawrence and U. S. Patent No. 1,806,965 to Clewell.

The Smith patent was intended for metallic inks to be used for stamping letters on book-bindings. It listed terpinyl acetate among various recommended solvents but, like the patent to Doughty already dealt with, mentioned terpineol as the solvent of most standard use. It contained no data as to the vapor pressure at room temperature of the particular solvent which might be selected or as to its vapor pressure when heated to 150° C., and the vapor pressures of terpineol and terpinyl acetate widely differed.

The Lawrence patents were not introduced as anticipations of Gessler but only to show that butyl carbitol, which is mentioned in each patent as a solvent, was known some years before the date of Gessler's invention. Each patent dealt with ink transfers upon fabrics known as decalcomania. The first gives a formula in which the solvent butyl carbitol represents 45 parts as compared with 300 parts in Gessler's ink. The ink made under either Lawrence patent would be a thick wax-like paste unfitted for ordinary printing. The specification of the second Lawrence patent shows a confusion and lack of understanding of vapor pressures for it says that: "Butyl carbitol has a high vapor pressure at about 100° C, so that it does not evaporate with sufficient rapidity to substantially vary the composition of the marking material."

The Clewell patent was before the Patent Office, as was the Doughty patent, and the

Gessler claims were nevertheless allowed. It mentions diethylene glycol as an ink solvent, but that solvent was only usable when combined with a stabilizer because it was too hydroscopic.

We hold that none of the patents of the prior art foreshadowed Gessler's invention which, as he says in line 20, column 2, p. 1 of his patent: "involves a recognition of the principle that some * * * high boiling solvents exhibit, at temperatures elevated above room temperatures, such a remarkable and quick increase in their vapor pressure that they volatilize rapidly, while at the same temperatures others show little change in their vapor pressures and therefore are practically non-volatile." He pointed out the critical vapor pressures necessary to achieve his result and furnished the art with a formula that would tell printers how to avoid difficulties that had beset them for years.

■ But the defendant argues and secured a finding to the effect that the patent in suit contains claims and disclosures made more than two years after public use of Gessler's ink. It relies on a sale in April 1933 of the ink described and an amendment which Gessler introduced in his specification on September 28, 1935, as the defendant insists, to cover butyl carbitol acetate which had a lower vapor pressure than butyl carbitol. It seems to us however that the mention of ethyl alcohol in the amendment for the purpose of indicating the vapor pressure butyl carbitol was to approximate at a temperature of 150° C. did not alter the invention and was different from introducing claims not previously described as was done in Muncie Gear Works v. Outboard, Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171.

The last question is whether the ink used by the defendant on its presses infringed the claims in issue of the Gessler patent. In our opinion it did. Most of the plaintiff's like the defendant's inks substituted a selected narrow cut of petroleum as a solvent in place of butyl carbitol. It was equally efficacious and much less expensive. The plaintiff's ink was checked for vapor pressure with Gessler's original solvent (Record p. 85). The defendant did not begin to make a heat set ink until 1938. It made the infringing ink for a customer after the plaintiff's ink had previously been on the market. Both the plaintiff and defendant and the Frederick Levey Company all made inks having a high boiling petro-

leum cut as a solvent after Gessler's invention had blazed the way. It is true that Doughty said in his patent that: "certain higher boiling liquid saturated paraffin hydrocarbons, e.g., those present in fractions of kerosene boiling about 250° C. at normal pressure may be employed instead of terpineol." We think that the plaintiff is right, however, in saying that this furnished no adequate teaching for the substitution of a workable cut of petroleum as a solvent in the place of butyl carbitol.

Gessler made an ink employing butyl carbitol as a solvent and this solvent was used successfully in May 1932, by the Peterson Parchment Paper Company. In November, 1932 and during a part of 1933 the Cray-Finne Company using a like solvent obtained from the Zinnser Company, of which Gessler was the Chief Chemist, made up an ink, sold it to the Curtis Publishing Company and witnessed its successful operation on the presses of the latter. But, after a time the butyl carbitol ink tended to crack the glue-glycerine rollers used by Curtis, so that Gessler substituted butyl carbitol acetate as a solvent, which had no deleterious effect on the rollers. The butyl carbitol ink was also sold in 1933 by the Manufacturer's Printing Company to the Vegetable Parchment Paper Company of Kalamazoo, Michigan and worked satisfactorily and without injury to the rubber rollers which the Kalamazoo Company had in its presses. In the meantime, the Frederick H. Levey Company which furnished most of the printing ink to Curtis, developed an ink similar in operation to the Gessler ink, which it had obtained from the Cray-Finne Company. It employed a high boiling petroleum product as a solvent resulting in a less expensive ink than the one in which butyl carbitol acetate was used. Mr. Cray of the Cray-Finne Company had informed the Curtis Company of the ingredients of the inks he had sold to the latter some three or four months before he saw the ink with the petroleum solvent running on the Curtis presses. This development was followed by the making of a similar ink by the plaintiff, in which a petroleum cut was used instead of butyl carbitol or butyl carbitol acetate.

It is argued that the use of a petroleum cut as a solvent was anticipated by the suggestion of kerosene for use in that capacity in the Doughty patent, but the composition of kerosene had changed since 1922 when the Doughty patent issued. Moreover kerosene is a mixture of a large number of dif-

ferent hydrocarbons with different degrees of volatility, whereas the vapor pressure of butyl carbitol is substantially constant during evaporation. The specially prepared petroleum solvents employed by the plaintiff and also by the defendant were introduced in the three petroleum inks after the information derived from the Gessler invention had become available and its teaching could serve as a basis for trying experiments with a solvent that had the characteristics of butyl carbitol and was much less expensive. In holding that the defendant followed the teachings of Doughty rather than those of Gessler, the District Court ignored these considerations as well as the testimony of Satenstein that the Doughty ink would not work for ordinary printing.

Finally, it is argued that the vapor pressure of the ink solvent of the defendant at 150° C. (known as 502-C.) does not approximate that of ethyl alcohol at ordinary temperature. The specification gives the vapor pressure of butyl carbitol at 150° C. as 6 cm., and of ethyl alcohol at ordinary temperatures as 4 cm. In our opinion, the vapor pressure of the defendant's solvent approximates that of ethyl alcohol within the meaning of that word as used in the claims. That the word "approximates" gives leeway of at least 2 cm., is plain, since the vapor pressure of the solvent especially recommended in the specification was 6 cm., at 150° C., that is to say, 2 cm. greater than the pressure of ethyl alcohol at ordinary temperature. In other words, the vapor pressure of butyl carbitol is as close to the vapor pressure of ethyl alcohol, as is the vapor pressure of the defendant's solvent. The degree of difference that was regarded as precluding an approximation is illustrated by the solvent dibutyl pthalate mentioned at page 2, line 9, of the Patent as being a pressure of only .14 cm. at 150° C. and evaporating slowly. When the patent says that at 150° C. the vapor pressure of the solvent must approximate that of ethyl alcohol, it means approximate it for the purpose in question, that is, for making the ink dry quickly. This the defendant's solvent does.

■ Inasmuch as the defendant's ink was undoubtedly compounded with Gessler's teaching in view and the latter's device involved a highly important step in the art, it is only reasonable to .hold that it is within the claims of the patent relied on. To employ an ink that would retain its consistency until the paper was imprinted and then would instantly dry on the application of an amount of heat not injurious to the paper, involved more than ordinary talent. By recognizing that some high boiling solvents volatilize rapidly upon a rise of temperature, while others remain practically non-volatile, and by defining the class useful for the purposes desired, Gessler satisfied a long felt want. He made an ink that was not the product of a pedestrian worker in a laboratory but of a chemist of imagination who was able to conceive of and employ a solvent that had the apparently inconsistent attributes of maintaining the consistency of the ink until it had passed over the rollers and had done the printing and of then instantly evaporating, upon the application of heat, so that its surface would be dry and not rub off. We hold that Gessler devised such an ink and that his discovery was an invention for which a patent was justly awarded.

The Decree is reversed with directions to grant a judgment sustaining the claims in issue and holding them infringed, with the usual injunction and reference.