## SUTHERLAND PAPER CO. v. GRANT PAPER BOX CO. et al.

### Civ. A. No. 6013.

United States District Court
W. D. Pennsylvania.

Jan. 25, 1949.

See, also, D.C., 8 F.R.D. 416.

Pennie, Edmonds, Morton & Barrows, by Raymond F. Adams, Curt Von Boetticher, Jr., and H. Stanley Mansfield, all of New York City, and Mahlon E. Lewis, of Pittsburgh, Pa., for plaintiff.

Christy, Parmelee & Strickland, by William H. Parmelle, L. Clyde Strickland and Eiffel B. Gale, all of Pittsburgh, Pa., for defendants.

Carl E. Glock, of Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., for defendant Carl G. Dreymann.

GIBSON, Chief Judge.

This is an action for a declaratory judgment on validity and infringement of Patent No. 2,031,036, on an application of Carl G. Dreymann. The application was filed on May 17, 1934, and the patent was issued to the Grant Paper Box Company on February 18, 1936. The title to the patent is in the Grant Paper Box Company, but the assignment from Dreymann reserves to him the right to veto any sale or license of the patent.

By the patentee's recitation he presents one phase of an effort to create a moisture-proof package for the packing of foods which require moisture exclusion for their temporary preservation. The invention is of a sheeted form of a composition which has adhesive ability to unite plies of paper and constitutes part of a container wall for food to be preserved.

The recital asserts that moisture-proof paper, as a rule, is made by coating the paper with paraffin, but states that paraffin, although sometimes used as an adhesive to unite two sheets or plies of paper, is not sufficiently strong for the purpose. Reference is then made to "amorphous, substantially saturated compounds formed from high-boiling-point, nonsaturated petroleum derivatives by polymerization and possibly by condensation, and which are known as 'petrolatum', having properties that, modified by certain additions, render them adequate, when extended to the form of sheet or film, not only to withstand penetration by moisture, but also to adhere to sheets of fibrous material upon which they may be extended, and to unite sheets of such material between which they may be spread and incorporated. Lately, higher melting substances have been separated from petrolatum and mineral oil and are sold as 'wax', to distinguish them from other crystalline, saturated hydrocarbons, sold as 'paraffin.' The melting-points of these substances vary from 120° to 170°, F."

After reciting a procedure in consequence of which the adhesive and plasticity of the amorphous compounds is increased, the patentee, in his description of the patent, stated: "Such procedure consists in dissolving a lesser or greater amount of a substance that, on cooling to about the temperature at which the coating is applied, or just before solidification, forms in the compound a colloidal suspension or gel. I shall use the term colloidal suspension as inclusive of a gel."

The following is quoted from line 40, second column, of first page of the specification:

"These colloidal suspensions or gels may be produced by adding to the base material certain substances, which at low temperature are not at all or only partly soluble in the base material, but which can be rendered soluble either by increasing the temperature, or by adding also an intermediary substance in which both the base material and the gel-forming substances are soluble.

"As substances which will form colloidal suspensions or gels I may mention: metal stearates, natural and artificial resins (such as coumarone resin), modified phenol-formaldehyde resins, glycol-phthalic acid resins, and other condensation and polymerization products on the market, as also copal and other gums, and so on. Among these coumarone resin, phenol-formaldehyde resin and copal gum are best; and of these three I have found coumarone resin very satisfactory. In using coumarone resin a solvent should also be employed and a suitable (and non-volatile) solvent is ester gum."

The specification describes what is known commercially as petrolatum, and specifically those higher melting substances separated from it and sold as petrolatum wax, to which has been added an unstated amount of a substance which at a particular temperature forms in the composition a colloid suspension or gel. One cannot read the specification without coming to the conclusion that the patentee declared, and felt it to be a part of his invention, that a foreign non-wax colloid material must be added to the base material. Such possible materials were specified as capable of forming such colloidal suspensions or gels: "metal stearates, natural and artificial resins (such as coumarone resin), modified phenol-formaldehyde resins, glycol-phthalia acid resins, and other

condensation and polymerization products on the market, as also copal and other gums, and so on. Among these coumarone resin, phenol-formaldehyde resin and copal gum are best; and of these three I have found coumarone resin very satisfactory."

In his description the patentee set forth a discovery of an adhesive which required the addition of a foreign non-wax colloid to the petrolatum base. That is what he sought to give the world, and that is what must limit his patent.

The validity of the patent is the first inquiry which faces the Court in its present duty.

The specification accentuates the adhesive feature of the patent claim, by alleging that "This invention consists in a composition of matter having adhesive and water-proofing properties, and the method of its production." The patent, however, contemplates several features which have been made main features in other claimed inventions. The patentee was interested in the preparation of a laminated paper package for the preservation of foods. Whether he was interested in the paper package, the lamination of it, or the use of a proper adhesive composition to bind it together, he was quite certain to come into elbow touch with other inventions claimed along the same line. Laminant requirements were known. Fiske Patent, issued in 1912, and Fietech Patent, issued in 1918, were laminant patents for the preservation of foods. The use of paraffin as a laminant was known. And Mac-Laren Patent, No. 1,905,923, issued in 1933 upon an application filed in 1929, was for an improved wax composition which could have been used to secure the same adhesive result as that claimed for the patent in suit. That patent was only for a wax composition and no specific use of it, other than as a wax, was claimed for it. Other patents indicate the need of the subject-matter of Dreymann's patents, but those patents did not meet the need. That remained for Dreymann to meet, and he attained commercial success with his inventions. True, his success is limited by the extent of his discovery, and then, only in case of infringement.

The present action is not the first that brought the Dreymann Patent into litigation. In 1941 the Grant Paper Box Company brought suit against Russell Box Company in the District Court of the United States for the District of Massachusetts, wherein it charged the defendant with infringement of the patent. The facts of that case were essentially the same as those appearing in the present action. The plaintiff in the instant action, Sutherland Paper Company, and the defendant in the Massachusetts case, Russell Box Company, each have relied upon a composition free from any added non-wax materials.

In Grant Paper Box Co. v. Russell Box Co., in the District Court of Massachusetts, judgment was that the patent was valid but that defendant had not infringed. From this judgment an appeal was filed in the United States Circuit Court of Appeals for the First Circuit. 154 F.2d 729. That Court reversed the judgment of the District Court, holding that the patent was invalid. This judgment was based upon Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644. The plaintiff then moved for a rehearing, which was granted, and the Circuit Court of Appeals, feeling that it had been in error in its interpretation of Sinclair & Carroll Co., Inc. v. Interchemical Corp. after rehearing, vacated its judgment reversing the District Court's decree and entered judgment for the plaintiff, by which it held that the Dreymann patent was valid and had been infringed.

In its finding of validity the Circuit Court of Appeals pointed to the fact that Dreymann was a chemist of long experience; that by his own investigations he had made certain discoveries as to the nature of petrolatum waxes which enabled him to obtain the patent in suit and to put upon the market an invention which obtained commercial success. He had not, as had the patentee in the Sinclair & Carroll Co., Inc. case, supra, claimed a patent by merely adding another person's discovery to an article having well known characteristics, but had used his own discovery.

In his claim of invention Dreymann, it must be admitted, was dealing with some

compounds whose functions were well known. Amorphous Petroleum wax (petrolatum wax) had known characteristics. It was combined with boxboard to produce a known product, laminated paper. The benefit he obtained was by means of the use of the wax as a bonding agent. He produced a thin flexible moisture-proof boxboard which was able to carry printing and could be folded into cartons for the preservation of food, without losing its moisture-proof quality. Theretofore, such boxes, lacking flexibility, could not be formed without losing the ability to exclude moisture. His boxboard, due to the adhesive quality of the composition of the patent, led to a reasonable commercial success and justified the patent which was issued upon his petition.

But while this Court is of opinion that the patent was valid, it does not wish to be understood as holding that it was valid without any qualification, because it was subject to the same rules which limit the scope of all patents.

It will be remembered that the First Circuit Court of Appeals, in its opinion following the rehearing in Grant Paper Box Co. v. Russell Box Co., supra, held that the patent was valid and infringed. Its finding upon the issue of infringement cannot be followed. It quoted the third claim of the patent, as follows:

"3. A container wall for the packaging of material including a sheet or film composed substantially of an amorphous petroleum wax of an apparent melting-point of 120°-170° F., carrying a suspended colloid, and two sheets of fibrous material, the sheet or film of said wax intercalated between the sheets of fibrous material and constituting a film of adhesive uniting the whole." 151 F.2d 886.

The opinion stated that the question of infringement hinges on the interpretation of Dreymann's patent. "If he taught only the addition of some foreign colloid to relatively pure amorphous petroleum wax, as the defendant contends, the defendant does not infringe for the reason that it adds nothing foreign to petroleum to the amorphous wax it uses. If, on the other hand, the plaintiff's patent covers amorphous petroleum wax carrying a suspended colloid, regardless of the source of the colloid, as a bonding agent for paper for the purposes specified, then upon the finding made below to the effect that both the plaintiff's and the defendant's waxes have approximately the same colloidal content, infringement is indicated." [154 F.2d 731] Upon the basis thus stated, the opinion proceeds to an interpretation of the third claim of the patent which is so wide of the knowledge and intent of the patentee at the time the claim was made, and so contrary to the rules which should govern this Court in its interpretation, that this Court cannot accept it. It seems to ignore the duty of the patentee to clarify his claims by means of his specifications. See Standard Oil Development Co. v. James B. Berry Sons' Co., Inc., 3 Cir., 92 F.2d 386.

The claim is for a container wall "including a sheet or film composed substantially of an amorphous petroleum wax * * * carrying a suspended colloid." This does not in itself limit the patentee to amorphous petroleum wax to which a foreign colloid has been added. That which does so limit it is the prior finding of facts and the teaching of the specifications.

Such interpretation placed upon the claim would mean that the unsworn matter, inserted in the specification after the original claim was filed, had the effect of amending it, and would invalidate the patent. The proof is that the patentee had no such knowledge of the possibilities of the petrolatum waxes when the specification was filed, and cannot now assert an accidental use of words to establish a patent claim which was not even within his imagination when the language was used.

When this claim was filed the patentee had in mind a composition which included a colloid foreign to petroleum and which was a valuable and patentable step in the art of providing moisture-proof boxes for the preservation of food. True, investigation and continued reduction of the oil content in waxes have at least reduced the value of the discovery, but it seems plain that the patent, in providing an adhesive with an added colloid, is still valid;

but valid only to the extent of its specification.

In view of the plain proof that the Sutherland Paper Company, the plaintiff, has not used an added colloid, the Court must find that it has not infringed the defendant's patent.

The Court has not discussed contentions which have been advanced by each party in opposition to its opponent's claim.

█ The defendants have asserted that the Sutherland Paper Box Company was estopped from proceeding with its case by reason of a contract it made with defendant. After Sutherland had given notice of an intent to withdraw from the license contract, it was induced to withhold that action and agreed to await the result of a case brought against the Russell Box Company by the Grant Paper Box Company. If the plaintiff succeeded in that case, the Sutherland Paper Company was to continue with the payment of the license; but if it lost, the amounts so paid were to be returned to the Sutherland Company. After the Grant Paper Company had obtained a judgment in that case, the Sutherland Company renewed its notice of cancellation, but agreed that the amounts withheld belonged to the Grant Paper Box Company.

The testimony shows some possibility of misunderstanding of the agreement between the parties, but does not establish unclean hands and estoppel of the Sutherland Paper Company to proceed with the instant case. An order to that effect will be made.

█ The Sutherland Paper Company has charged unclean hands on the part of the Grant Paper Box Company which will preclude it from proceeding with its counterclaim. The charge is an alleged violation of the Clayton and Sherman Acts, 15 U.S.C.A. §§ 1–7, 15 note, 12–27, by an agreement which precludes the counterclaimant from granting proper rights under the patent. The Court is of opinion that the matter is without merit.

### Decree.

And now, to wit, January 25, 1949, the Complaint of Sutherland Paper Company and the Answer and Counterclaim of Grant Paper Box Company and Answer of Carl G. Dreymann having come on to be heard, upon consideration thereof, it is ordered, adjudged and decreed:

(1). That a declaratory judgment in favor of Sutherland Paper Company and against Grant Paper Box Company and Carl G. Dreymann be entered, declaring that United States Letters Patent No. 2,031,036 is not infringed by said Sutherland Paper Company.

(2). That an injunction restraining said Grant Paper Box Company and Carl G. Dreymann, their officers, agents, servants and employees, and all those in privity with defendants from asserting or charging that the laminated paper or any other product now made and sold by said Sutherland Paper Company infringes said United States Letters Patent No. 2,031,036.

(3). That judgment be awarded plaintiff upon the counterclaim of Grant Paper Box Company against it.

(4). That judgment for costs be awarded plaintiff.

(5). That United States Letters Patent No. 2,031,036 is valid to the extent that it claims an adhesive composition with a colloid added which is not a part of the petroleum compound.

The Court, after hearing and consideration, makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact.

1. This is an action for declaratory judgment under Section 274d of the Judicial Code, U.S.C.A., Title 28, § 400 [now §§ 2201, 2202]. Plaintiff, Sutherland Paper Company, is a Michigan corporation. Defendant, Grant Paper Box Company, is a Pennsylvania corporation, with an office and a place of business in Pittsburgh, Pennsylvania. Defendant, Carl G. Dreymann, is a citizen of the State of Pennsylvania, residing in Pittsburgh, Pennsylvania.

2. Defendant, Grant Paper Box Company, owns the legal title to Patent No. 2,031,036 by assignment from Carl G. Dreymann subject to an agreement between defendant, Grant Paper Box Company, and defendant, Carl G. Dreymann, under which

defendant, Grant Paper Box Company, agreed not to assign such patent or grant any licenses thereunder without written consent of defendant, Carl G. Dreymann, and, in the event defendant, Grant Paper Box Company, granted licenses for the manufacture of moisture-proof cardboard or cartons made therefrom or sells moisture-proof cardboard for the manufacture of cartons, the royalty in each case should be fixed and agreed upon between the defendants.

3. Defendant, Carl G. Dreymann, is the patentee of Patent No. 2,031,036 in suit and the owner of a beneficial interest therein.

4. Plaintiff is a manufacturer of paper products and uses, in such manufacture, uncompounded commercial petroleum waxes in the form in which they have been made and sold by petroleum refiners since 1932, or earlier, without additional substances of any kind.

5. Defendant, Grant Paper Box Company, is a competitor of plaintiff in the manufacture of paper products.

6. Defendant, Grant Paper Box Company, has charged plaintiff with infringement of Patent No. 2,031,036 in suit and plaintiff has denied this charge. Plaintiff brought this action for a judicial determination of the questions of validity and infringement of such patent and for other relief. Defendants have counterclaimed for an injunction restraining plaintiff from infringement of said patent and for an accounting of profits and damages. A real controversy exists.

7. Patent No. 2,031,036 relates to a wax composition for coating and laminating paper products. Each of the claims of the patent defines the composition as composed substantially of (1) an amorphous petroleum wax of an apparent melting point of 120°–170° F. or a base substance composed of such amorphous petroleum wax (2) carrying a suspended colloid.

8. The specification defines the requirement of "substantially" as being at least 20 per cent amorphous petroleum wax, the remainder of the compound may be paraffin wax.

9. "Petroleum waxes" in ordinary usage include any or all of the waxes derived from petroleum such as the paraffin waxes which form relatively large crystals and are easily separated from the oil, and the amorphous waxes which form relatively small crystals and are less easily separated from the oil. Amorphous waxes are now known as microcrystalline waxes, and are also called petrolatum waxes because they are made from petrolatum.

10. The patent uses the term "petroleum wax" in a special sense to distinguish amorphous or microcrystalline waxes from the paraffin waxes.

11. "Petrolatum" in ordinary usage refers to an intermediate product made from petroleum residuums which includes amorphous waxes and a substantial proportion of oil. Neither petrolatum nor the materials found therein are gel-forming substances within the meaning of the patent.

12. The patent states that the essential feature of the invention is the formation of a colloidal suspension or gel in the wax composition. As examples of materials forming such colloidal suspension in the amorphous petroleum wax, the patent names five substances, none of which nor any equivalent of which is found in the waxes used by plaintiff.

13. The patent lists a series of examples comparing amorphous petroleum wax compositions forming the colloidal suspension embodying the asserted invention of the patent with compositions lacking this quality. The third example in the patent is an uncompounded commercial petroleum wax. The patent does not describe it as adequate for the purposes of the patent and there is no suggestion in the specification that it contains any of the substances described as characteristic of the compositions of the patent.

14. The patent is indefinite in that a man skilled in the art cannot tell from the patent in suit whether or not the petroleum wax of this third example is a composition carrying a suspended colloid.

15. The amount of additional substance required to form the composition of the patent cannot be determined by reference

256

to effect on viscosity or effect on melting point. The patent gives no test for determining whether a composition is or is not a laminating composition.

16. The invention claimed by the patent in suit is not the same invention disclosed by the application as originally filed. As originally filed, the application expressly recited that petrolatum waxes were not adequate for the purposes of the asserted invention. The invention originally asserted was the addition of a foreign non-wax colloidal substance to petrolatum or petrolatum wax to make it adequate for the purposes of the invention. There was no suggestion that any material, native to petrolatum or petrolatum wax, served such purpose and the application suggested the contrary as a fact.

17. Ten months after the original application was filed, and without a supplemental oath, the specification was amended by deleting a statement that petroleum waxes were not adequate and substituting a statement that they were not always adequate. This resulted in broadening the claimed invention to a point where it cannot be determined whether an uncompounded wax without additional substances, such as the petroleum wax of Example 3, is an illustration of the art over which the invention is asserted to be an advance or an example of the composition claimed by the patent.

18. The application, as supported by Dreymann's original oath, did not cover a compound free from added non-wax materials.

19. A year after the original application was filed, and again without a supplemental oath, the specification was further amended to change a statement that the composition of the patent might preferably include petroleum wax to an amount of at least 20 per cent to a statement that it is requisite that the base material contain petroleum wax to the amount of at least 20 per cent.

20. Commercial microcrystalline waxes came on the market in volume in the late 1920's and early 1930's. Such waxes are by-products produced in the refining of petroleum stocks to make lubricating oils. Wax production is incidental to lubricating oil production.

21. Commercial microcrystalline waxes made and sold prior to 1934 did not differ substantially from the microcrystalline waxes employed by plaintiff in its operations. The patentee Dreymann was familiar with such commercial microcrystalline waxes at about the time he filed his application for the patent in suit, including the wax made by the Socony Vacuum Oil Company and identified as Product 2305, the use of which by plaintiff is here charged to infringe.

22. The defendant, Dreymann, did not complete the asserted invention of the patent in suit prior to his application for the patent on May 17, 1934.

23. The specific composition of the patent in suit was known prior to any date that can be claimed for the patentee Dreymann, and is described in the MacLaren Patent No. 1,905,923, granted April 25, 1935, the Bennett Patent No. 1,955,527, granted April 17, 1934 on an application filed May 3, 1932, and the Fietsch Patent No. 1,269,918, granted June 18, 1918.

24. The attainment of satisfactory lamination is not dependent upon the formation of a colloidal suspension or gel in a wax. it is dependent upon the co-relation of the conditions under which lamination is effected, including temperature of and application of the adhesive, the viscosity thereof at the time of application, the speed of the laminating operation, the porosity of the materials being laminated, the time interval between application of the adhesive and application of laminating pressure and the temperature at which the adhesive gels, as is asserted by defendant, Dreymann, in his Patents Nos. 2,031,035 and 2,152,732, not in suit.

25. All materials sold as amorphous petroleum wax or microcrystalline wax contain oil and this has been true since prior to Dreymann's date, the function of the oil is to determine the melting point of the wax and this was known prior to Dreymann's date.

26. The formation of a colloidal suspension or gel in microcrystalline waxes is inherent in such waxes and is due to the delay in congealing of such waxes, which results from the fact that such waxes contain a

large numer of individual hydrocarbons which have specifically different melting points so that solidification begins with the highest melting point constituent and continues in a thickening mixture of molten wax and suspended solid wax and ends with the solidification of the lowest melting point constituents.

27. Prior to the application for the patent in suit, the art knew the requirements for a satisfactory laminant, namely, adhesiveness, flexibility and moisture-vapor-proofness, as well as the requirement that the laminant should be viscous so that it would not strike through the paper to its outer surface to interfere with printing on the paper, as is shown by the Fiske Patent No. 1,033,756, granted July 23, 1912, and the Fietsch Patent No. 1,269,918, granted June 18, 1918.

28. Prior to the application for the patent in suit, the art knew all the characteristics of petrolatum wax, particularly the characteristics of adhesiveness, flexibility, moisture-vapor-proofness and viscosity.

29. Prior to the application for the patent in suit, laminating with paraffin wax was known in the manufacture of air or moisture-proof packages, as is shown by the Stokes Patent No. 1,343,235, granted June 15, 1920, and the Beecher Patent No. 1,936,-375, granted November 21, 1933, on an application filed December 18, 1929.

30. Prior to the application for the patent in suit, and beginning in March, 1932, the Lowe Paper Company of Ridgefield, New Jersey, manufactured and sold to the Dixie Cup Company laminated caps for use with ice cream containers using as a laminant a mixture of paraffin wax and microcrystalline wax purchased from the Vacuum Oil Company, Inc. The laminant used contained more than 20 per cent microcrystalline wax in a paraffin wax mixture and was designed to prevent penetration of moisture from the ice cream into the cardboard cover disc. Cover caps in excess of 33 million caps were manufactured in 1932 alone and such manufacture was continued until a date subsequent to the application for the patent in suit.

31. The oral agreement between plaintiff and defendants made in June, 1941, was merely an agreement to waive the prior termination notice and to continue under the terms and conditions of the license agreement of August 2, 1940 upon defendants' promise to repay subsequent royalties in the event of an adverse decision in the action pending in Boston and was not an agreement under which plaintiff was to be bound by the decision in the Boston litigation.

32. The uncompounded petroleum wax used by plaintiff contains more than 90 per cent microcrystalline wax, the balance being oil.

33. Oil is not a substance forming a colloidal suspension or gel within the meaning of the patent in suit. Oil is not insoluble or partly insoluble in microcrystalline wax at the congealing temperature as required of the gel-forming substance by the patent in suit. The addition of oil does not increase the viscosity or the melting point of microcrystalline wax as required of the gel-forming substances by the patent in suit.

34. The patent in suit does not teach the use of oil as an additional substance to form the compound of the patent and oil admittedly is not a satisfactory substance to form the colloidal suspension or gel of the patent in suit.

35. There is no evidence that the petroleum waxes used by plaintiff contain any substance forming a colloidal suspension or gel within the meaning of the patent in suit, or insoluble or partly insoluble in wax at the congealing temperature, or increasing the viscosity or the melting point of wax, or any other test suggested by the patent to identify gel-forming substances of the patent.

36. The wax Product 2305 used by plaintiff has not changed significantly in its characteristics since it was first manufactured in 1930 except that it is a little lighter in color and more free from oil.

37. The patent in suit is not limited to any particular strength of laminating bond produced by the wax composition of the asserted invention.

38. Defendant, Grant Paper Box Company, has filed an answer and counterclaim averring that Sutherland Paper Company

is estopped by virtue of pre-existing contractual relations from attacking the validity of the patent, and asking alternatively for relief against infringement or relief by virtue of such pre-existing contractual obligations.

39. Claim 3 only of the patent is involved in litigation. Said claim reads as follows:

"3. A container wall for the packaging of material including a sheet or film composed substantially of an amorphous petroleum wax of an apparent melting-point of 120°–170°F., carrying a suspended colloid, and two sheets of fibrous material, the sheet or film of said wax intercalated between the sheets of fibrous material and constituting a film of adhesive uniting the whole."

40. The said Dreymann patent, as to claim 3, has been held valid and infringed by the First Circuit Court of Appeals in the case of Grant Paper Box Co. v. Russell Box Co., 1 Cir., 154 F.2d 729. Certiorari to the Supreme Court was denied 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 639.

41. In reference to a suspended colloid referred to in the claim, the patent specification states (page 1, column 2, line 36 et seq.):

"Such procedure consists in dissolving a lesser or greater amount of a substance that, on cooling to about the temperature at which the coating is applied, or just before solidification, forms in the compound a colloidal suspension or gel. I shall use the term colloidal suspension as inclusive of a gel."

42. The patent in page 1, column 2, line 41, describes substances "which at low temperature are not at all or only partly soluble in the base material, but which can be rendered soluble either by increasing the temperature, or by adding an intermediary substance in which both base material and the gel forming substance are soluble." This describes the class of substances which constitute colloid suspensions within the meaning of the claim, and substances that do not behave in this fashion are thereby not included.

43. The patent specification, page 1, line 49 et seq., lists a number of materials including "metal stearates", "natural and artificial resins", "other condensation and polymerization products on the market", "copal and other gums", "and so on". These were materials that the patentee considered most satisfactory for the purpose.

44. The patent specification on page 2, column 1, line 7 et seq., discloses on the material used, and teaches that the substance should increase the viscosity beyond 65° at 210° F. by the Saybold universal viscometer. This gives the man skilled in the art exact information as to the condition required to produce an adequate adhesion.

45. The same part of the specification shows that paraffin cannot be raised to a viscosity where it is adequate.

46. To secure gel formation it is necessary to have two or more substances of different character or different behavior melted together, and they must be mutually soluble where melted together and become like one substance.

47. The patent specification, page 1, column 1, last line and column 2, states:

"Lately, higher melting substances have been separated from petrolatum and mineral oil and are sold as 'wax', to distinguish them from other crystalline, saturated hydrocarbons, sold as 'paraffin'."

The patent in so referring to wax separated from petrolatum and oil makes reference to a purified substance.

48. Vacuum Oil Company wax was designated "Cerese" wax. Later Socony Vacuum Company produced 2305 which was advertised as containing very little oil. It was then a hard wax having a penetration of 20 to 25 and a viscosity of 65, and is now a softer wax, penetration 25 to 35 and a viscosity of 60–70.

49. There was no absolutely similar product on the market when Dreymann made his invention.

50. In the product, the film of wax is about one one-thousandth of an inch thick, but it has exceptional moisture vapor resistance properties and is more moisture vapor proof than cellophane.

51. Because of the high moisture vapor resistance the laminated product will keep foods in containers made from it in their

original condition for a longer period of time. It surprised users. Although the laminated product of claim 3 sold for about double the price of ordinary cardboard boxes it met with immediate success, and such companies as the Heinz Company and Loose-Wiles Company placed orders for one million cartons. In a relatively short time Grant shipped to widely separated parts of the country, whereas the normal market for a box maker is about a 150 mile radius.

52. The amorphous wax barrier between the two sheets of paper is highly flexible and allows the box to be folded without the film being ruptured.

53. It is essential that the sheets of box board and paper be strongly united, and that they cannot be peeled apart. The patent teaches that this adhesiveness may be secured by the use of wax carrying a colloid in suspension.

54. Amorphous petroleum wax carrying a colloid in suspension can be spread on one sheet of paper in a liquid, waterlike state to form a thin film free of pin holes, and instead of being soaked into the paper like ink into a blotter, or immediately solidifying like candle wax, forms a tacky gel upon contact with the cold paper, and by reason of such delayed solidification will stick and bind the second sheet of paper that is subsequently brought into contact with it.

55. Sutherland accepted a license on August 2, 1940.

56. Grant filed suit against Russell Box Company in Massachusetts on February 7, 1941.

57. Sutherland served notice of intention to discontinue the oral agreement February 24, 1943.

58. Sutherland, with the notice of February 24, 1943, did not release to Grant the royalties already paid under the oral agreement, but made their ownership subject to the outcome of the suit.

59. Sutherland has used no. 2305 wax since 1947.

60. At the time of trial, Sutherland was using only Ceretak and Adhese M, and has used these since the beginning of 1948.

61. Ceretak is an amorphous wax preparation produced by the Bareco Oil Company. It is substantially the same as a previous product made by that company and used by Sutherland and sold as Victory wax.

62. Ceretak is a product specially prepared for laminating by blending wax and petrolatum and from selected petrolatums and tank bottoms.

63. Ceretak wax contains about 10 per cent of viscous oil. (Pl.Ex. 73.)

64. At the time Dreymann made his invention, amorphous wax contained only 4 or 5 per cent. of such insoluble materials.

65. The specially produced Ceretak wax provides in the laminated product a film of amorphous petroleum wax carrying a colloid in suspension. It has a melting point of 155 and is therefore within the range of 120° to 170° as defined by claim 3. It is intercalated between two sheets of paper and firmly bonds them together.

66. Compound 2305 of Socony Vacuum Oil Company is not an amorphous petroleum wax, but is a blend, and is designated "Product 2305". (Def.Ex.J.J.J.)

67. All of the important prior art patents except Fiske, No. 1,033,756, were set up in the Boston case. (Ex. A, p. 5 and 7 and 456.)

68. Fiske No. 1,033,756 relates to the use of pitch for laminating and says that pitch is an "ideal material". Amorphous petroleum wax is not similar to pitch.

69. There is no evidence that any of the prior art materials were ever successfully used.

70. The caps for ice cream cups produced at Lowe Paper Company were of cardboard with a layer of grease-proof paper carried thereon by a material which permitted the paper to be readily peeled off. At least 50 per cent. of paraffin was used in this mixture. The product was entirely different from Dreymann's and was for use in an entirely different field.

71. The Lowe prior use is not an anticipation of Dreymann.

72. The conditional nature of the assignment from Dreymann to Grant does not impose any restraint on trade. The condi-

260

tional assignment with the collateral agreement by which Grant acquired title to the Dreymann invention was for the purpose of protecting Dreymann and securing to him the benefits of his invention.

73. The conditional agreement and assignment between Dreymann and Grant did not act to restrict commerce in any patented or unpatented commodities.

74. The conditional nature of the assignment from Dreymann to Grant is a normal and proper restriction for the protection of Dreymann who sold his invention for a contingent benefit.

### Conclusions of Law.

I. The Court has jurisdiction of the parties and the cause of action presented by the pleadings.

II. The patent in suit, No. 2,031,036, is not infringed by plaintiff.

III. Plaintiff is not estopped to maintain its action by reason of the oral agreement of June, 1941.

IV. Claim 3 of the Dreymann patent is good and valid to the extent of the specification.

V. Defendants are not guilty of unclean hands.